42 So.2d 65

**STATE ex rel. MURTAGH v. DEPART-
MENT OF CITY CIVIL
SERVICE et al.**

No. 38662.

March 21, 1949.

On Rehearing June 30, 1949.

Henry G. McCall, City Atty., Henry B. Curtis, John F. Connolly, Asst. City Attys., New Orleans, for appellant.

Charles J. Rivet, New Orleans, for appellee.

PONDER, Justice.

In this case we are adopting the written reasons handed down by the trial judge as a part of our opinion because he has so aptly stated the facts and properly disposed of the issues presented. His reasons for judgment are, as follows:

"The relator, James H. Murtagh, seeks the issuance of a writ of mandamus directing the City Civil Service Commission for the City of New Orleans, the City Director of Personnel of the City of New Orleans, and the Mayor of the City of New Orleans, to reinstate him in the employment of the Civil Service of the City of New Orleans as a clerk in the Permit Division and to give him the necessary certification of facts which would entitled him to payment of his salary as provided by the City Civil Service Act, Act No. 171 of 1940, as amended, since his discharge by the Mayor of the City of New Orleans on September 9, 1946.

"The relator has been in the employ of the City of New Orleans since 1925. His position at the time of his discharge was that of a clerk in the Permit Division and his duties involved the clerical processing of applications and the issuance of permits required by Ordinance No. 15,510 CCS, as amended, for various street activities. On June 15, 1942, he entered upon defense employment with the Delta Shipbuilding Company, and upon the termination of his defense employment he returned to work for the City of New Orleans on August

20, 1945. It is the relator's contention that he received an indefinite leave of absence without pay in order that he might assist the war effort by working in a defense plant. The defendants, on the other hand, contend that he resigned his city position. While the relator was in defense employment, the City Civil Service Act went into effect. The City Attorney in office at that time ruled that the chief clerk and employees in the Permit Division were employees of the Mayor and in the unclassified service.

"In the course of its lengthy task of classifying City employees, in which expert assistance was employed, the City Civil Service Department, after a ruling by the Legal Committee, placed all the positions in the Permit Division under the classified service. Accordingly, the relator was classified as Clerk II in the classified service. On June 1, 1946, his salary was reduced from $200 a month to $170 a month to conform to the pay scale for clerk II in the classified service. On June 19, 1946, upon the request of the Mayor for a ruling, the present City Attorney rendered an opinion that the employees of the Permit Division were in the unclassified service. From June 15, 1946, until the relator was discharged by the Mayor on September 9, 1946, his salary was paid at the rate of $200 a month as an unclassified employee rather than $170, the salary to which he would be entitled as a classified civil servant.

"Following his discharge, without cause, on September 9, 1946, the relator sought and obtained a hearing before the Civil Service Commission of the City of New Orleans. In a determination by that Commission, James Hugo Murtagh v. Mayor of the City of New Orleans, No. 26, January 25, 1947, the Commission held that the relator was in the unclassified Civil Service and consequently outside the ambit of protection afforded by the civil service laws. Having exhausted his administrative remedies, the relator now seeks a judicial determination of his rights under the civil service law.

"The defendants have filed an exception of no cause of action founded on the contention that mandamus does not lie. The plea is not well founded, for mandamus is a special writ authorized by the Code of Practice, Articles 828–834, designed to order public officers to perform the mandatory duties which their offices impose upon them. If the petitioner was improperly discharged, he is entitled to the writ he seeks. Mandamus is the most common form of remedy utilized for this type of action throughout the United States. Field, Civil Service Law, 230-35 (1939). This writ has been used on many occasions in the State of Louisiana for the purpose of determining the right of a civil service employee to his employment. State ex rel. Sonnenberg v. Board, 1922, 149 La. 1095, 90 So. 417; State ex rel. Hughes v. Board, 1922, 150 La. 1, 90 So. 410; State ex rel.

Tallant v. Board, 1926, 161 La. 361, 108 So. 770; State ex rel. Pepper v. Board, 1933, 177 La. 740, 149 So. 441.

"The first question presented on the merits is whether the petitioner was in the employ of the City on January 1, 1943, and thus blanketed into the Civil Service by Section 11 of Act No. 171 of 1940, as modified by Act No. 368 of 1942. Section 11 of Act No. 171 of 1940 provides:

" 'Every person who, on the first day of July, 1942, is legally occupying, by permanent appointment thereto, a position placed by this Act in the classified service, shall be entitled to occupy such position, without further tests of fitness for such employment, and shall become subject to the provisions of this Act * * *.'

"Act No. 368 of 1942 suspended the effective date of Section 11 until January 1, 1943.

"The evidence in respect to the relator's departure from City employment for defense work on July 1, 1942, is confused. The files of the City offered in evidence are not complete; some evidence points toward a leave of absence and some toward a resignation. The relator has submitted in evidence a carbon copy of a letter, the original of which he has testified he sent to the Mayor. This letter contains a request for an indefinite leave of absence for the purpose of obtaining defense employment. Relator testified that he received an affirmative reply granting this request

but that he has lost that letter. However, Mr. Daniel E. Knowles, the Secretary to the Mayor at that time, and originally called as a witness by the defendants, testified that he definitely recalled the letter granting a leave of absence to the relator, because he himself wrote the letter. If any unfavorable inference is to be drawn from the petitioner's failure to produce the letter, he alleges he received from the Mayor authorizing his request, an even greater unfavorable inference must be drawn from the City's failure to place in evidence any records signed by the petitioner from the City's files indicating either a leave of absence or a resignation.

"The City relies upon the relator's 'Employee's Record' of Delta Shipbuilding Company, in which, in response to a printed question relating to the reason for leaving the applicant's former employment, there is inserted by typewriter the word 'resigned'. However, that application is not a city record but an application for work with a private employer. Any applicant filling it out would assume it was designed to reveal whether or not he had left his previous employment voluntarily or had been discharged for cause. His response is nothing more than that he was advising his prospective employer that he had not been involuntarily discharged.

"In passing, it is to be noted that in the hearing before the Civil Service Commission no reference whatsoever was made by the Commission to the relator's defense

employment. The opening paragraph of the Commission's opinion, which was rendered on January 25, 1947, states:

" 'Appellant, James Hugo Murtagh, was in the employ of the City of New Orleans from about the year 1925 until September 9, 1946, on which date he was discharged by Mayor de Lesseps S. Morrison.'

■ "It is also to be noted that the terms 'resignation' and 'leave of absence' are terms of legal art having legal connotations which describe certain legal results. At the time the relator entered into defense work the City Civil Service Act was not yet effective, consequently these words did not have the connotations that they have today. Thus, when those words were entered on the various personnel and payroll records at that time, such words might well have been used interchangeably and indicated simply that the petitioner was no longer on the payroll of the City. Since they had no legal connotation then, they can not be utilized to-day to the determination of the manner in which the petitioner left his employment.

■ "The defendants have offered in evidence the rules of the Department of City Civil Service for the purpose of showing the rules in respect to leave. However, these rules were promulgated after the relator entered upon his defense employment and are not determinative of the problem of the type of leave the relator took at the time he commenced his defense employment. Also introduced by the de-

fendants is a Resolution of the Civil Service Commission on Status of Employees on Effective Date of Act, which reads as follows:

" 'For purposes of determining which employees shall be entitled to continue to occupy their present positions without further tests of fitness, persons legally occupying, by permanent appointment, positions in the classified service shall include persons who:

\*　\*　\*　\*　\*　\*

" '(c) were appointed on or prior to January 1, 1943, by a duly constituted appointing authority to positions in the classified service without restriction as to duration or condition of tenure and were listed as employees on that date but were absent from duty by reason of leave of absence with pay, or leave of absence without pay of not more than one year's duration.
\*　\*　\*"

■ "But this resolution is effective only to the extent that it is a correct and reasonable rule interpreting Section 11 of the Civil Service Act, which places no restrictions on leaves of absence. In this respect it must be remembered that January 1, 1943, the controlling date, fell at the height of the war effort. An employee granted a leave of absence for defense work had a right to assume that he was entitled to a leave of absence for the duration of the war. The resolution of the Commission is arbitrary in establishing retroactively a one-year limit on this type

of leave where none is established in the Civil Service Law. In spite of the resolution, the Director of Personnel testified that in the case of defense workers they were all readmitted, where it was shown they had obtained leaves of absence, even though their defense work lasted longer than a year.

■ "A Civil Service employee is presumed not to yield his rights in his employment. This presumption is particularly strong in the case of a career employee of long standing who took defense work, which was obviously of a temporary nature only, and thereafter returned to his position. The City has failed to produce a signed resignation of this employee. The conflicting evidence offered fails to overcome the presumption that he did not intend to resign.

"The principal question to be determined is whether the relator was in the classified or unclassified service. If he was in the latter, he gains no protection from the Act; but if he was a classified employee, his discharge would be invalid in that it was not in accordance with Section 33 of the Act.

"Section 10 provides:

"'(a) The unclassified service shall include the following positions:

$*$ $*$ $*$ $*$ $*$ $*$

"'(8) Officers, Secretaries and employees of the offices of the Mayor and City Attorney, Board of Liquidation City Debt and one member of the Louisiana Bar occupying a position in the City Service as legal counsel to any appointing authority.

$*$ $*$ $*$ $*$ $*$ $*$

"'(b) The classified service shall comprise all other positions now existing or hereafter created in the City Service.'

"The defendants contend that the relator is an employee of the office of the Mayor, and is thus in the unclassified service and may be dismissed without cause.

■ "The defendants point out that by Commission Council Ordinance No. 15,510 CCS, adopted in 1942, it is provided that persons desiring to engage in certain activities on the public streets and in public places

"'Shall first apply to and obtain from the Mayor of the City of New Orleans a permit $*$ $*$ $*$ which permit shall in each instance state the occasion for which it is issued and the length of time for which said permit shall be operated $*$ $*$ $*$' and that it is also provided that the Mayor shall have the authority to designate a Director of Permits and such inspectors, clerks and other assistants as may be necessary for the proper conduct of the Permit Division. By Ordinance No. 16,501 CCS, adopted on May 24, 1946, this latter provision was amended to provide that the duties of the Director of Permits are to be performed by the Chief Clerk of the Mayor. These ordinances superceded Ordinance 14,434 CCS, adopted in 1936, which

contained substantially similar provisions. The defendants thus argue that by virtue of these ordinances the Mayor is imposed by the Commission Council with the 'personal' duty of issuing these permits, which can be done either by himself or by his Chief Clerk and the assistants he appoints to perform these duties, which are 'personal' to him. In view of the 'personal' duty which is cast upon the Mayor by these ordinances, it is argued that all employees, no matter how numerous they may be or how detailed their duties, employed to perform these duties for the Mayor fall within the ambit of Section 10(a) (8) of the Civil Service Act. The Civil Service Commission founded its determination in the appeal by the relator before that body on this argument. If this conclusion is sound, the Commission Council merely by ordinance may and can declassify almost any classified employment by the simple expedient of placing such employment under the Mayor's office. The only positions safe from such manipulation would be those placed in other departments by the charter of the City of New Orleans. Thus the Civil Service Commission and the City of New Orleans are in effect contending before this court that the City Civil Service Act contains a provision which practically would authorize the destruction of the very system which it purports to establish. Civil Service Statutes are designed to secure adequate protection to public career employees from political discrimination. Rogers v. City of

Buffalo, 1890, 123 N.Y. 173, 25 N.E. 274, 9 L.R.A. Unless the courts protect civil servants in their legislative rights, the civil service system of employment could easily be reduced to a mockery.

"The provisions of Article XIV, Section 15 of the Constitution of 1921 have particular importance in the construction of the City Civil Service Act. Article XIV, Section 15, provides:

" 'The Legislature shall provide for civil service in municipalities having a population of one hundred thousand (100,000) or more, and for the recognition and adoption of the merit system in the employment or appointment of all applicants; and shall provide against the discharge of employees or appointees without good and sufficient cause.'

"It will be noted that the constitutional mandate to the Legislature provides for a merit system of employment and a protection from discharge without cause for all employees. There are no exceptions.

"Under such a mandatory provision in the organic law it might well be urged that any exemption whatsoever authorized by statute would be contrary to the solemn declaration contained in the Constitution. However, it has been recognized wherever the merit system is in existence that certain exemptions may be provided for if they are founded upon a substantial reason. But no blanket exemptions may be granted. A similar though not identical provision appears in the Constitution of the

State of New York, and in view of that provision the New York Court of Appeals has held that a statute purporting to exclude any group of state employees from the operation of the civil service law must demonstrate that it is impractical to include the excluded group within the Civil Service of State. Friedman v. Finegan, 1935, 268 N.Y. 93, 196 N.E. 755; Ottinger v. Civil Service Commission, 1925, 240 N.Y. 435, 148 N.E. 627, 629. The words of Mr. Justice Cardozo in the Ottinger case are particularly appropriate.

" 'A statute which declares in advance of the event that any and all positions now or at any time established in connection with this bureau shall be withdrawn from the jurisdiction of the civil service commission, and filled without examination of any kind, does not enforce the Constitution to the limit of the practicable.'

"In the Friedman case, which also quoted the above words of Mr. Justice Cardozo with approval, it was stated [268 N.Y. 93, 196 N.E. 756]:

" 'These exemptions which may be made by the Legislature or by the Civil Service Commission appointed under its authority must have relation to the duties of the office and not simply to the title which is used. In other words, there must be a reasonable exercise of the power given under the Constitution. With liberality in application, it must be that competitive examinations are not practicable for the position or office. There must be some-thing * * * in the nature of the duties which makes the service either one of confidence or else of such importance that personal selection instead of competitive examination is for the best interests of the public and the fulfillment of the particular duties. In other words, the Legislature cannot act arbitrarily and exempt places from competitive examination at will. The duties must have some relationship to the exemption and the classification must be reasonable.'

"Although the decisions of the Court of New York do not have the binding effect of law in this jurisdiction, there is no doubt that the Friedman and Ottinger cases correctly express the law on this subject.

"It is to be noted that at the time the City Civil Service Act was passed the above-quoted provision of the Constitution was the only constitutional declaration upon the entire matter of civil service. However, after the passage of the State Civil Service Law and the City Civil Service Law in 1940, Acts Nos. 172, 171, the Constitution was amended so as to make the provision of the organic law with respect to Civil Service read as follows:

"Article XIV, Section 15:

" '(a) The Legislature shall provide for civil service in municipalities having a population of one hundred thousand (100,-000) or more, and for the recognition and adoption of the merit system in the employment or appointment of all applicants; and shall provide against the discharge of em-

ployees or appointees without good and sufficient cause.

" '(b) The "State Civil Service Law" * * * and the "City Civil Service Law" * * * are hereby ratified, approved and affirmed. Any bill or bills amending or repealing either of said acts in whole or in part, directly or by implication, may be passed and become laws only when adopted by a two-thirds vote of the members elected in each House of the Legislature of the State of Louisiana.'

 "It is not necessary in this proceeding to determine whether this constitutional amendment had the effect of raising the civil service law to the dignity of organic law. For even if the amendment did just that, it must be presumed that the Legislature in enacting the City Civil Service Act intended to carry out the mandate of Article XIV, Section 15 as it existed at that time and that it did not intend to create in either the Act or the constitutional Amendment an illusory civil service law which carried within its very provisions a wholesale power of destruction and avoidance. This is particularly true in light of the fact that the former provision of the Constitution was not stricken therefrom, but was reenacted as Section (a) in the identical language it had previously contained, when it stood as the sole constitutional provision. Rather, the constitutional Amendment taken as a whole is indicative of an intent to give further force and vitality to the civil serv-

ice law and to prevent hasty and ill-considered legislation by requiring a two-thirds vote to make any alterations in the law. When the City Civil Service Act is read in the light of Sections (a) and (b) of Article XIV, Section 15 of the Constitution there can be little doubt that it was the legislative intent to exclude from the classified service only elective, non-municipal, policy-making, and confidential officials and employees.

"Parochial officials and their employees and the employees of the New Orleans City Park Improvement Association, a State Agency under Act No. 104 of 1934, Dart's Gen.St. Sec. 6245.1, were properly excluded because these are not municipal offices.

 "There is another reason why an employee of the Permit Division should not be excluded from the classified service. The charter of the City of New Orleans does not place the Permit Division under the office of the Mayor. In fact, it is silent as to such a division.

"The Permit Division is under the Mayor's office simply by virtue of a delegation of powers by the City Commission Council. The contention that the City Council can, by placing any division under the Office of the Mayor, declassify that position, by virtue of Section 10(a) (8), completely ignore the provision of the City Charter which provides:

" 'All other persons (after naming certain appointive officers) engaged in any

capacity in connection with any department of the Government of the City of New Orleans shall be chosen in accordance with such Civil Service laws as may now or hereafter be in effect.' Act No. 301 of 1946, § 1, amending Act No. 159 of 1912, § 12. Compare Sec. 1, Act No. 338 of 1936.

"If the term employees of the office of the Mayor as used in Section 10(a) (8) of the Civil Service Law.is not to be confined to employees in confidential positions, it must, in any event, be limited to those employees of the office of the Mayor provided for in the charter of the City of New Orleans and cannot be extended to include employees of division or departments placed under the office of the Mayor for administrative purposes by the Commission Council.

██ ██ "The argument in relation to the payroll on which the petitioner was carried and his rate of pay need only be mentioned in passing. Any City employee, classified or unclassified, is entitled to pay, and his status in civil service can in no wise be affected by the payroll or account on which he is carried. The fact that the petitioner was overpaid during a certain period if he was in the classified service does not operate to take him from the protection of the civil service law. It simply gives the City a right of action to recover the overpayment. Otherwise, mere overpayment on the part of the City's disbursing officials could destroy the merit system. Nor does

the argument that the place of employment of employees of the. Permit Division was at one time (though not now) within the physical confines of what is known as the Mayor's office have any bearing in determining his status under Section 10(a) (8). Mere facts of architecture do not create or destroy civil service rights."

██ The trial judge gave judgment in favor of the plaintiff based on the reasons set forth above and the defendants have appealed. While we think the trial judge's reasons for judgment are adequate, there are additional reasons why the judgment should be affirmed.

██ From our examination of the jurisprudence of other states, we find that appointments without examination are usually based on the confidential nature of the position or the impracticability of ascertaining the fitness of an employee by an examination. The position held by the plaintiff is not, in our opinion, one of a confidential nature or one that an examination would be impractical as a mode of ascertaining the fitness of an applicant for such position. Something more than the mere performance of official duties of a clerical nature under the direction of another is required in a position of a confidential nature.

██ Ordinance 15,510 CCS is nothing more than a license statute. It regulates and fixes the cost of permits for engaging in various businesses in and on the public streets of the city. The fact that the

Commission Council placed this department under the supervision of the Mayor and designated the funds derived from the permits to be a contingent fund to be expended by the Mayor at his discretion does not change the nature of this department.

The Legislature undoubtedly contemplated what is strictly speaking the officers, secretaries and employees of the Mayor's office when it placed the provision, under consideration, in the statute. In other words, it contemplated what is generally accepted as the office force of a Mayor and not employees of other departments placed under his supervision.

The fundamental purpose running through civil service laws is that positions shall be filled by competitive examinations. Appointments without examination are the exceptions and not the rule. Friedman v. Finegan, 268 N.Y. 93, 96, 196 N.E. 755; Andresen v. Rice, 277 N.Y. 271, 14 N.E.2d 65; Neary v. O'Connor, 173 Misc. 696, 18 N.Y.S.2d 634, 639.

The provision of the statute, under consideration, should be strictly construed because it is an exception to the general rule laid down in the statute and it should be clearly shown that the position held by the plaintiff comes clearly within the exception. The Civil Service Commission undoubtedly entertained grave doubts as to the classification of this position because it is stated in its reasons for denying the plaintiff's appeal to be placed in the classified service:

"It is conceded that there is room for differences of opinion in this matter and that very persuasive arguments have been advanced by both sides in favor of their respective contentions. In reaching the conclusion that the appellant's position is in the unclassified service, this Commission feels that it has adopted the better view."

Where exceptions are provided for in a statute laying down a general rule, the exceptions must be strictly construed. 50 Am.Jur. 451, par. 431 and 455, par. 434; 59 C.J. 1092, par. 643.

The rule governing the construction of general statutes containing exceptions or exemptions is well stated in Crawford on Statutory Construction, page 609, par. 299, as follows:

"As we have hitherto stated, the appropriate and natural office of the exception is to exempt something from the scope of the general words of a statute, which would otherwise be within the scope and meaning of such general words. Consequently, the existence of an exception in a statute clarifies the intent that the statute should apply in all cases not excepted.

"Unlike that of the proviso, however, it is apparent that the position of the exception in the statute, is unimportant. But the exception is also subject to the rule of strict construction, that is, any doubt will

be resolved in favor of the general provision and against the exception, and anyone claiming to be relieved from the statute's operation must establish that he comes within the exception. Indeed, the liberal construction of a statute would, in many instances, seem to require that the exception, by which the operation of the statute is limited or abridged, should receive a restricted construction."

A strict construction of the provision, under consideration herein, carries out the general purpose of the civil service law. A liberal or tax construction of it would have a tendency to avoid the end sought to be attained.

For the reasons assigned, the judgment is affirmed. All legal costs to be paid by the appellants.

O'NIELL, C. J., takes no part.

McCALEB, Justice (concurring).

While I am unable to subscribe to all of the reasoning in the opinion of the trial judge, which the majority has adopted, I am persuaded that the conclusion reached herein is legally correct—that is, that relator is entitled to civil service status despite his prior inconsistent conduct and successful evasion of the law in order that he could receive a salary greater in amount than that permissible under classified service.

It is my belief that subsection (a) (8) of Section 10 of Act No. 171 of 1940, excepting employees of the Mayor's office from classified service, refers to those employees engaged in the place where the Mayor conducts his routine duties and who, in various capacities, assist him in the performance of his daily tasks. In short, the retinue of the Mayor's office. Examination of the civil service law as a whole has convinced me that the Legislature did not intend to exclude from the classified service, employees of a separate governmental department, such as the Permit Department, notwithstanding that it is placed, by law or ordinance, under the control and supervision of the Mayor.

Moreover, in spite of the fact that relator's testimony, relative to obtaining a "leave of absence" and his receipt of an alleged confirmatory letter from the Mayor, places a great strain upon my credulity, I am satisfied that he did not "resign" in the sense that it was his intention to sever completely his relations with the City at the time he obtained employment in a defense plant.

The truth, as I see it, is that, when relator left his job to enter defense work, he intended to return to the City Hall, where he had been employed for almost twenty years, as soon as the war work was concluded. And I have no doubt that the former Mayor anticipated and expected that he would return. In this light, it is evident that relator's separation from his job is to be viewed as a leave of absence without pay rather than a "resignation"

contemplating a severance of the employment forever. Of course, it is manifest that relator did not obtain the leave with the idea of protecting any civil service status which he might later acquire, as it is not disputed that he did everything possible to avoid civil service classification and was successful in his efforts.

But, be this as it may, relator was actually granted a leave of absence and, therefore, was entitled to be placed (and was placed after his return) in the same category as all other city employees who, according to the testimony of the Director of Civil Service Personnel, were given permanent classified status even though their leaves of absence without pay, while engaged in the war effort, had extended beyond the one year limit set forth in the resolution of the City Civil Service Commission on Status of Employees on Effective Date of Act.

I concur in the decree.

HAMITER, Justice (dissenting).

If the placing of the Permit Division (in which relator was admittedly employed as a clerk) under the control and supervision of the Mayor had been accomplished by an ordinance adopted subsequent to the passage of the City Civil Service statute, Act No. 171 of 1940, I should agree unhesitatingly that the position in question fell within the classified service; because, if that were the case here, such an ordinance could not effectively declassify a classified employment.

The fact is, however, that the placing of the Permit Division under the control and supervision of the Mayor occurred several years prior to the passage of the City Civil Service statute, specifically on August 14, 1936, through the adoption of Ordinance No. 14,434. It provided, among other things, that every peddler shall secure from the Mayor a permit; that the Mayor shall prescribe rules and regulations as to the form of application for permits and their issuance; that the Mayor may designate a director of permits who, subject to the direction of the Mayor, shall function as the head of the Permit Division and who shall sign all permits; and that the Mayor may also designate such inspectors, clerks and other assistants that may be necessary for the proper conduct of the Permit Division and shall fix their salaries.

That ordinance of 1936, with reference to the powers, functions and authority of the Mayor, was not changed by the ordinances of 1942 and 1946, except to the extent of providing that the duties of the director of permits were to be performed by the chief clerk of the Mayor. Neither has the validity of that ordinance, or of the amending ordinances, been directly attacked in this action.

Therefore, prior to and at the time of the enactment of the City Civil Service law by the Legislature of 1940, the Mayor was

charged with the official duty of employing, supervising and controlling all clerks in the Permit Division, including this relator; those clerks, in other words, then were employees of the office of the Mayor. This being true they were and are, in my opinion, governed by the following clear and unambiguous provisions found in Section 10(a) (8) of Act No. 171 of 1940:

"The unclassified service shall include the following positions: * * *

"Officers, Secretaries and employees of the offices of the Mayor * * *."

The holding of the majority seems to be predicated largely on what is referred to as a strict construction of the statute. But the provisions under consideration, I maintain, need no construction; they are clear and free from all ambiguity. And applicable here are the following observations contained in State v. Maestri, 199 La. 49, 5 So.2d 499, 502:

"If the legislative act is unambiguous, obviously it needs no construction. The words of the act speak for themselves. They alone best declare the intention of the lawmaker.

* * * * * *

"We are admonished by Article 13 of the Civil Code that 'when a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit.'

"Where the meaning of a statute is clear and unequivocal, the Court has noth-ing to do with its policy or impolicy. The duty of the Court in such a case is to expound and administer the law as it is written. Any other course would require the Court to abandon its judicial function and assume the legislative function which, of course, it can not do."

See also City of Shreveport v. Southwestern Gas & Electric Company, 140 La. 1078, 74 So. 559 and Hibernia National Bank v. Louisiana Tax Commission, 195 La. 43, 196 So. 15.

I respectfully dissent.

## On Rehearing

MOISE, Justice.

We granted a rehearing in this case limited to relator's right to recover his salary from the date of his discharge to the date of his reinstatement, in order to ascertain with certainty whether this question was raised at any time before the application for rehearing.

There must be an end to litigation and, on rehearing, this Court has consistently declined to consider points not urged or adjudicated upon in the district court nor not raised or argued in the original hearing before us. Sorbe v. Merchants' Ins. Co., 6 La. 185; Rightor v. Phelps, 1 Rob. 330; Garland v. Holmes, 1 La.Ann. 405; Allen v. Buisson, 35 La.Ann. 108; Stephens v. Duckett et al., 111 La. 979, 36 So. 89; and State of La. ex rel. Lawrence A. Che-

hardy et al. v. New Orleans Parkway Commission et al., La., 41 So.2d 678.

The defendant argues for the first time on rehearing that even if relator is reinstated to his position, he is not entitled to the loss occasioned by him through his unlawful discharge and is, therefore, estopped from claiming lost pay; and that, under the provisions of Sec. 34 of Act No. 171 of 1940, the Civil Service Commission was vested with discretion to award or deny full pay for lost time when ordering relator's reinstatement. In answering this argument, relator contends:

"In their brief on rehearing the appellants, for the first time, invoke the provisions of Sec. 34 of Act No. 171 of 1940, as authority for the proposition that the Commissions authorized by said act were *vested with absolute discretion to award or deny full pay for lost time when ordering the reinstatement* of employees discharged or disciplined for other than religious or political reasons. Inasmuch as relator and appellee was denied reinstatement by the Civil Service Commission for the City of New Orleans, said Commission did not have occasion to exercise said arbitrary discretion and the constitutionality vel non of such delegation of power to an administrative board was never an issue in this case. Said obnoxious delegation of powers was not invoked in the trial court nor in this Honorable Court on original hearing and relator and appellee was never before afforded the occasion or opportunity to plead the unconstitutionality thereof, * * *." (Italics mine.)

The defendants did not raise any of these points in their answer nor did they urge them in the district court or in this Court on the original hearing. As a general rule, a rehearing will not be granted on account of matters or questions different from those urged at the original hearing and this rule is departed from only in cases where the refusal of the rehearing would work manifest injustice. We find that this was not the situation here. Therefore, our original holding in this case will not be disturbed because of the following reasons: (1) The original judgment as to back salary follows the jurisprudence of this Court established by many adjudications. State ex rel. Sonnenberg v. Board of Com'rs, 149 La. 1095, 90 So. 417; State ex rel. Hughes v. Board of Com'rs, 150 La. 1, 90 So. 410; State ex rel. Exnicios v. Board of Com'rs, 153 La. 705, 96 So. 539; State ex rel. Charles v. Board of Com'rs, 159 La. 69, 105 So. 228; State ex rel. Caire v. Board of Com'rs, 174 La. 516, 141 So. 46; State ex rel. Pepper v. Sewerage & Water Board, 177 La. 740, 149 So. 441.

The second is because the doctrine of estoppel urged on rehearing has no foundation in law. The relator received a salary in excess of the salary paid to Civil Service employees. If this is true, the law gives to the City a remedy against relator for this over-payment. The salary came

through the regular payrolls. All knew the facts and, having such knowledge but being mistaken as to the application of a remedy at law is no basis for estoppel. Brian v. Bonvillain, 111 La. 441, 35 So. 632; Wells v. Blackman, 121 La. 394, 46 So. 437; Bayard v. Baldwin Lumber Co., 157 La. 994, 103 So. 290; and Wadley v. Gleason, 192 La. 1052, 190 So. 127.

For these reasons, consideration of the question of back salary is denied.

O'NIELL, C. J., takes no part.

HAMITER, Justice (concurring in the decree).

On the original hearing, in a dissenting opinion, I expressed the view that relator is not entitled to reinstatement for the reason that the position which he occupied when discharged was not within the classified service provided for in the City Civil Service statute. To this view I adhere.

It now becomes necessary to decide the question of whether the defendants should be permitted to present and argue on this rehearing an issue which was not raised by them on the original hearing. The jurisprudence of this court, as I appreciate it, compels a negative answer to the question.

For these reasons I respectfully concur in the decree rendered on the rehearing by the majority.

On Rehearing.

HAWTHORNE, Justice (dissenting).

The effect of the decision of the district court and of this court on original hearing is that a finding by a court that an employee has been erroneously discharged under the City Civil Service Law, Act No. 171 of 1940, and an order of reinstatement automatically entitle the employee to full pay from the date of dismissal. This, in my opinion, is not the law. Act No. 171 of 1940, sec. 34, clearly sets out the law in regard to this matter as follows:

" * * * After hearing and considering the evidence for and against * * * disciplinary action [including dismissal], the Commission shall approve or disapprove the action. In case of approval the disciplinary action shall be deemed final as ordered. *In case of disapproval the Commission shall reinstate the employee under such conditions as it deems proper, and may order full pay for lost time.*

"If the Commission finds that the *disciplinary action was for religious or political reasons,* then the employee shall forthwith be reinstated in his position and be reimbursed for any loss of pay occasioned by such disciplinary action." (Italics mine.)

On application for rehearing I was doubtful, in view of the above quoted provision, of the propriety of the action of the court in passing on the question of the plaintiff's pay for lost time, which amounts to ap-

proximately $5700.00 to date, for which he has rendered no services, since the commission had not had occasioned to pass on that question. Assuming, however, that the action of the court was proper, I am of the opinion that the refusal of the court to consider on rehearing the question of the plaintiff's right to pay for lost time works a manifest injustice against the city in this case.

The facts of this case from my examination of them do not disclose that the plaintiff was dismissed for religious or political reasons, so that he would not be entitled automatically to pay for lost time under the act. And, if we presume to exercise the discretion given to the commission in the matter under other circumstances of dismissal by Act No. 171 of 1940, I am of the firm opinion that under the particular facts and circumstances of this case the plaintiff is not entitled to his lost pay, and that to award it to the plaintiff would be most inequitable and unfair to the city.

I respectfully dissent.

McCALEB, Justice (dissenting).

A rehearing was granted herein in order to consider whether the judgment of the lower court is erroneous insofar as it orders relator's "reinstatement" as a civil service employee from the time of his discharge instead of from the date of finality of the judgment. Notwithstanding this, the majority decree that the rehearing will not be

entertained for the reason that the question (for which the rehearing was granted) was not raised or argued on the original hearing. Yet, in the body of the opinion, it is found

(a) That the judgment of the lower court "reinstating" relator in classified service from the date of his discharge from unclassified service is in accord with the jurisprudence of this court, and

(b) That the doctrine of estoppel urged by the city "has no foundation in law."

I am not in accord with any of the grounds upon which the refusal to consider the rehearing is pitched.

Initially, I find it difficult to discern why the court decrees that it will not pass on the question for which the rehearing was granted. It is true that it has been said in a number of cases that the court will decline to consider, for the first time on rehearing, points which are not raised in the district court or upon original hearing. But this rule has been breached when the court was inclined to do so, see Harper v. Sid Simmons Drilling Co., 164 La. 767, 114 So. 647, and is, admittedly, not followed in cases "where the refusal of the rehearing would work manifest injustice."[1] If there ever was a case of palpable inequity, this is it—for here, as a consequence of the order of the court below, the City of New Orleans is being forced to pay relator $170 per month from September 9th 1946 until the date of the finality of this decree;

---

[1] See majority opinion on rehearing.

not for any service he has performed; not because he was wrongfully discharged from civil service but because he was discharged from a position in the unclassified service which this court has finally determined to be in classified service. Indeed, the City is being penalized because relator was discharged from an employment which was taken out of civil service by reason of relator's request in order that he could retain a $200 per month salary instead of the $170 limit for Clerk II under the civil service law.

The majority hold that, under the jurisprudence,[2] the lower court was correct in ordering relator's "reinstatement" as of the date of his discharge. However, it takes no more than a casual examination of the cited authorities to demonstrate their total inapplicability to the facts presented here. In those cases (Sonnenberg and the like), the employees were admittedly holding positions in civil service and were discharged without cause under various pretexts. In such circumstances, it is only just and meet to restore the employees to their positions with full pay as of the date of their unlawful discharge. This is in keeping with the basic purpose of civil service.

But, in the case at bar, the relator was not in classified service at the time of his discharge; he did not claim to be in such service; in fact, he avoided any such classification. Accordingly, the Mayor had the right to assume that relator could be summarily discharged with or without assigning cause. Relator's rapid change of face in appealing to the Civil Service Commission was not actually a claim for "reinstatement" but, rather, for a determination that his position was within the classified service despite his successful endeavors to evade classification thereunder.

The uncontroverted evidence in the case reveals that, after termination of his work at a defense plant in 1945, relator was re-employed as a clerk in the Permit Department of the City at $200 per month salary. At that time, employees in the Permit Department were not classified in civil service under a ruling of the City Attorney's office made in 1943. However, in April 1946, just prior to the induction of the present city administration into office, the heads of various city departments, including the Director of Permits, applied to the City Civil Service Commission for a ruling to determine their status, i. e., whether their particular department and personnel were under the classified service. On April 29th 1946, the Commission ruled that all of the various city departments, including the Permit Department, were in classified serv-

---

[2] State ex rel. Sonnenberg v. Board of Com'rs, 149 La. 1095, 90 So. 417; State ex rel. Hughes v. Board of Com'rs, 150 La. 1, 90 So. 419; State ex rel. Exnicios v. Board of Com'rs, 153 La. 705, 96 So. 539; State ex rel. Charles v. Board of Com'rs, 159 La. 69, 105 So. 228; State ex rel. Caire v. Board of Com'rs, 174 La. 516, 141 So. 46; State ex rel. Pepper v. Sewerage & Water Board, 177 La. 740, 149 So. 441.

ice and relator was classified as Clerk II under the Civil Service Act with a reduction in salary from $200 to $170 per month forasmuch as the maximum salary for a Clerk II could not exceed the latter figure. Thereafter, in the early part of May, when the present Mayor took office, relator called upon him and requested that he be declassified so that he would not be forced to take a reduction in salary. The Mayor told relator that it would be all right with him, if relator could obtain a ruling from the City Attorney that employees of the Permit Department were not within the classified service. The desired opinion was obtained and relator was thereafter placed in unclassified service with no reduction in pay. His salary remained at $200 per month until his discharge on September 9th 1946. As soon as that occurred, he immediately reversed his stand claiming that his job was in the classified service, appealed to the Civil Service Commission and then to the courts.

Although the question of whether employees of the Permit Department are within classified service, in view of Section 10(a) (8) of Act No. 171 of 1940, has been the subject of considerable uncertainty [3] that matter has been finally set at rest by our original opinion herein. And, by that decision, relator has been restored to his former position at a reduced salary. But I cannot perceive how this favorable

ruling affords any basis whatever for the conclusion that relator is entitled to be paid for services he did not render during the time that he was litigating the present case when the situation in which he found himself at the outset of the suit had been brought about through his own conduct.

But, say the majority, "the doctrine of estoppel urged on rehearing has no foundation in law." This resolution overlooks the well-established jurisprudence that a mandamus proceeding for reinstatement under a civil service law is an equitable cause in which relief will not be granted, as a matter of right, "but in the exercise of a sound judicial discretion and upon equitable principles." United States ex rel. Arant v. Lane, 249 U.S. 367, 39 S.Ct. 293, 294, 63 L.Ed. 650 and Duncan Townsite Co. v. Lane, 245 U.S. 308, 38 S.Ct. 99, 62 L.Ed. 309. Accordingly, it is subject to all equitable defenses. United States ex rel. Arant v. Lane, supra; Nicholas v. United States, 257 U.S. 71, 42 S.Ct. 7, 66 L.Ed. 133; State ex rel. McCabe v. Police Board, 107 La. 162, 31 So. 662; Ziemer v. City of New Orleans, 195 La. 1054, 197 So. 754 and authorities there cited.

In the case at bar, one of the defendants, Mayor Morrison, has specially pleaded in his answer that relator is "estopped by his actions and representations, and by the payments, prejudices and detriments induced thereby upon the City of New Orleans, to

---

[3] Two opinions of the City Attorney (1943 and 1946), diverse opinions of the City Civil Service Commission and dissenting opinion of Justice Hamiter on original hearing.

maintain this suit; to deny his status or to invoke any rights or benefits under the Civil Service, which plea of estoppel respondent invokes and specially asserts as a bar to all relief herein prayed for by relator". The majority declare that this plea is not well founded because everyone knew the facts and were mistaken only as to the law.

I cannot subscribe to this view. The facts above set forth portray, in my opinion, a clear case for the application of estoppel resulting from relator's acceptance of benefits and acquiescence in the ruling of the City Attorney that his position was not within the classified service. See 31 C.J.S., Estoppel, § 107 et seq. See also Magee v. United States, 282 U.S. 432, 51 S.Ct. 195, 75 L.Ed. 442. Under the same title the rule is stated thus, in 19 Am.Jur. Section 64:

"Estoppel is frequently based upon the acceptance and retention by one having knowledge or notice of the facts or benefits from a transaction, contract, instrument, regulation, or statute which he might have rejected or contested. This doctrine is obviously a branch of the rule against assuming inconsistent positions, and it has been said that such cases are referable, when no fraud either actual or constructive is involved, to the principles of election or ratification rather than to those of equitable estoppel. The result produced, however, is clearly the same and the distinction is not usually made. Such estoppel oper-

ates to prevent the party thus benefited from questioning the validity and effectiveness of the matter or transaction insofar as it imposes a liability or restriction upon him, or, in other words, it precludes one who accepts the benefits from repudiating the accompanying or resulting obligation."

I respectfully dissent.