433 So.2d 184 (1983)
Donald J. THORESON, et al.
v.
DEPARTMENT OF STATE CIVIL SERVICE, et al.
No. 82 CA 0374.
Court of Appeal of Louisiana, First Circuit.
February 22, 1983.
Rehearing Denied June 28, 1983.
*186 Richard C. Cadwallader, Baton Rouge, for appellants.
Laura Denson Holmes, Dept. of State Civil Service, Baton Rouge, for appellee.
Before EDWARDS, WATKINS and SHORTESS, JJ.
SHORTESS, Judge.
Plaintiffs, fifty-nine employees of the Department of Transportation and Development (DOTD), filed suit against the Department of State Civil Service (appellee) to challenge the manner in which a Uniform Pay Plan was applied to their classification in the Civil Service System. Plaintiffs are employed in the class known as Engineer Specialist III. As such, they maintain they are entitled to equal pay with employees in another classification known as Engineer III. The Uniform Pay Plan established and implemented by the State Civil Service Commission (Commission) became effective on August 2, 1975. The Plan was intended to provide a general increase in salary for all classified employees and further to provide special upward pay adjustments for 211 classes. Both Engineer Specialist III and Engineer III were included within these 211 classes, and it was via these special pay adjustments that parity between the two groups was to be accomplished. However, because of an insufficient appropriation of funds by the 1975 Legislature and subsequent fiscal limitations placed on the Plan by executive orders from Governor Edwin Edwards, the Plan was only partially implemented.
Because the provision for parity was commingled with the special pay adjustments, parity was lost when the Plan was only partially implemented. The result of this partial implementation was that plaintiffs, Engineer Specialists III, who were in Steps 5-10 of the original classification, were placed in lower steps in the new pay range, although they did receive pay increases.[1] Those employees who were Engineer Specialists III in Steps 1-4 were treated the same as Engineers III in Steps 1-4. Thus, parity was accomplished as to these employees. Also, employees who attained the status of Engineer Specialist III after August 2, 1975, were placed on steps according to the new pay range and effectively advanced further and with higher pay than plaintiffs, who have more seniority.
Plaintiffs initially sought relief through correspondence with various agency and State officials. In July of 1979, plaintiffs attempted to obtain relief through the DOTD Grievance Procedure, but were unsuccessful. Thus, on August 31, 1979, plaintiffs filed with the State Civil Service Commission a Petition for Correction and Determination of Pay Scales. Plaintiffs alleged that the Plan as implemented and applied to their classification was inequitable and in violation of the concept of a uniform pay scheme for Civil Service employees and against the basic premises of a merit system. They requested that the Commission investigate the matter and advance plaintiffs the requisite number of steps in order to effectuate parity between the two classes, and to revise its rules if necessary. The Commission dismissed plaintiffs' petition, stating that it was without jurisdiction to entertain the suit. Plaintiffs appealed to this court, where we held that the Commission did have jurisdiction to entertain the appeal through the exercise of its executive *187 and legislative functions. Thoreson v. State Dept. of Civil Service, 396 So.2d 367 (La.App. 1st Cir.1981). The case was remanded to the Commission for a determination on the merits.
On February 5, 1982, The Commission issued an opinion wherein it declined to exercise its executive and legislative powers to grant relief to plaintiffs. The Commission admitted that the 1975 Pay Plan, as prepared for submission to the Governor, intended to provide the same pay range for Engineer Specialists III and Engineers III, via a special upward pay adjustment. However, the Commission felt that DOTD, in failing to grant parity to plaintiffs when administering the Plan, was merely implementing the Plan according to the Governor's orders. It felt that the Governor's orders precluded granting parity to these plaintiffs with Engineers III. The Commission interpreted its own Rule 6.12[2] as allowing an employee to be demoted in "steps" in the implementation of a new pay range, so long as no reduction in salary occurred, and further held that there was no "vested right" to be placed on the same or any specific step in a new pay range. Thus, the Commission felt that the Governor's orders, as implemented by DOTD, did not offend the Constitution or any of the Civil Service rules. Plaintiffs also complained of discrimination, alleging that employees with less seniority were receiving higher salaries or greater percentage increases than plaintiffs, who had longer experience in the system. The Commission held that under our decision in Hollingsworth v. State Through Dept., Etc., 354 So.2d 1058 (La.App. 1st Cir.1977), writ denied, 356 So.2d 1010 (La.1978), any variance in pay came about solely as a result of the mechanics of the system and not any discriminatory application of the plan. The Commission stated:
"The Commission takes judicial notice from its own files that the impact of minimum implementation was statewide. Employees in approximately thirty-five classes were more severely impacted than the Engineering Specialists III. Employees *188 in 2053 classes were less severely impacted, but also affected.
"Every employee in 211 classes that received special adjustments met the same problems of potential pay relationship imbalance. The three largest departments of the State, which employ over half of the State employees, never fully implemented the full benefits of the August 2, 1975 pay plan. The Engineering Specialists, while impacted by the `mechanics of the system', were not singled out for discrimination.
"Accordingly, for the reasons given, this Commission declines to exercise its executive and legislative powers to grant the relief sought by appellants."
From this decision, plaintiffs perfected this devolutive appeal.
Plaintiffs challenge several facets of the establishment and implementation of the 1975 Pay Plan. Initially, plaintiffs allege that they suffered a particular injustice. They contend that due to partial implementation, not only were they deprived of the full proposed increase in pay, but they were also never granted parity with Engineers III as they had been promised and as was intended by the Plan.[3] Plaintiffs challenge on several grounds the correctness and constitutionality of the Governor's orders which provided for minimum implementation, the Civil Service rules which permitted minimum implementation, and the actual results flowing from minimum implementation. Lastly, since August 2, 1975, certain departments within the Civil Service system have been able to fully implement the Plan, while others have maintained partial implementation. Plaintiffs contend that this is discriminatory and in violation of the Constitutional mandate for the Commission to establish and adopt a uniform pay plan.
HISTORICAL BACKGROUND
Because of the complexity of the issues involved herein, we feel compelled to examine the historical background of the Civil Service System, the purposes for which Civil Service was established in Louisiana, and the Commission's constitutional duty to provide a uniform pay plan for public employees. The history concerning the passage of the Civil Service Amendment in our 1921 Constitution was summarized by the Louisiana Supreme Court in Louisiana Civil Service League v. Forbes, 258 La. 390, 246 So.2d 800 (1971), wherein the court stated:
"Act 18 of 1952, a Joint Resolution, proposed an amendment to Section 15 of Article XIV of the Constitution of Louisiana, relative to the establishment in the State and cities of the State of a certain population, of a civil service system based on merit. The amendment was submitted to the people on November 4, 1952; the vote was 306,198 `for' and 90,003 `against.' The effective date of the majority of the sections of the amendment was June 30, 1953." 246 So.2d at 806
The title to Act 18 of 1952 reads as follows:
"Proposing an amendment to Section 15 of Article XIV of the Constitution of Louisiana, relative to the establishment in the State and cities of the State of a certain population, of a civil service system based on merit." [Emphasis ours]
The Louisiana Constitution of 1921, Article 14, provided in Section 15(A)(1) for permanent appointments and promotions within the Civil Service System based on merit, efficiency, and fitness. Section (I) provided in pertinent part:
"There is vested in the State Civil Service Commission and in the appropriate City Civil Service Commissions for the several cities respectively the authority and power, after public notice and public hearing, *189 to adopt, amend, repeal and enforce rules which shall have the effect of law, regulating employment, transfers, promotion, removal, qualifications, and other personnel matters and transactions, and employment conditions and disbursements to employees, and carrying out generally in the foregoing respects, and as may be otherwise necessary to that end, the provisions and purposes of Civil Service as herein provided, including, but not by way of limitation, rules (1) providing for the approval or disapproval of disbursements for all personal services in the Classified Service; ... (6) establishing and recommending hours of work, provided that the rules establishing the hours of work shall not become effective until approved by the governor or governing body of the city, as the case may be; (7) providing for attendance records, conditions for payment of salaries, training and educational programs for persons in the State or City Services, and a uniform service rating system (including the manner in which ratings are to be used in promotions, salary increases, suspensions, and separations); ..." [Emphasis ours]
And further, in Section (I)(b) and (c):
"The State and City Civil Service Commissions shall adopt:

. . . . . .
(b) A classification plan, prepared and submitted by the Director or already in existence, requiring the classification of positions in the classified service according to similarity of duties performed and responsibilities assumed, so that the same qualifications may reasonably be required for, and the same schedule of pay may be equitably applied to all positions in the same class....
(c) Rules fixing minimum, maximum, and such intermediate rates of compensation as may be necessary, and establishing uniform pay plans and amendments thereof from time to time, according to duties and responsibilities, on the basis of recommendations of the Director after consultation by the Director with appointing authorities and the State or municipal fiscal officer, as the case may be, and resort to such other measures of investigation and research as he may deem desirable. In the adoption of a pay plan and amendments thereof for the State Service, differences in pay in private business and industry and the scarcity of applicants in the different areas of the State may be taken into consideration in fixing the different rates in the different localities and areas. Each employee shall be paid at one of the rates set forth in the pay plan for the class of position in which he is employed. The rate of any employee at the time the original pay plan takes effect shall not be reduced by such pay plan. A pay plan, or amendments thereto, of the State shall become effective only after approval of the Governor; and a pay plan and amendments thereto for any city shall become effective only after approval by the governing body of said city." [Emphasis ours]
The Louisiana Constitution of 1974, Article 10, Section 7, provides for permanent appointments and promotions "under a general system based upon merit, efficiency, fitness, and length of service, ..." Article 10, Section 10(A)(1), states as follows:
"Each commission is vested with broad and general rule-making and subpoena powers for the administration and regulation of the classified service, including the power to adopt rules for regulating employment, promotion, demotion, suspension, reduction in pay, removal, certification, qualifications, political activities, employment conditions, compensation and disbursements to employees, and other personnel matters and transactions; to adopt a uniform pay and classification plan; to require an appointing authority to institute an employee training and safety program; and generally to accomplish the objectives and purposes of the merit system of civil service as herein established. It may make recommendations with respect to employee training and safety. Nothing herein shall prevent the legislature from enacting laws supplementing these uniform pay plans for *190 sworn, commissioned law enforcement officers of the Division of State Police, Department of Public Safety and regularly commissioned officers of the Enforcement Division of the Department of Wildlife and Fisheries." [Emphasis ours]
Our review of the entire series of debates at the Constitutional Convention in 1973, surrounding the Civil Service provisions, does not indicate any intent on the part of the framers to change the duties of the Commission with regard to establishing a uniform pay plan, from what had been in practice since 1952.[4] Special provisions were placed in the 1974 Constitution establishing a separate classified civil service system for firemen and policemen in certain municipalities and parishes. La.Const.1974, Art. 10, Pt. II, Sec. 16-20. The Legislature was specifically given the right in Article 6, Section 14, to set minimum wages and working conditions for firemen and municipal policemen.[5] The Constitution also provides in Article 10, Section 10, that the Legislature is not prevented from passing laws to supplement a uniform pay plan for State Policemen and regularly commissioned officers of the Department of Wildlife and Fisheries. However, the debates surrounding the State Police Amendment and the amendment concerning the Wildlife Officers, further show that the intent of the framers was that these be exceptions to the exclusive power of the Commission to establish a uniform pay and classification plan for all classified employees, subject only to approval by the Governor.[6]
Rules promulgated by the Civil Service Commission have the effect of law. Sanders v. Dept. of Health & Human Resources, 388 So.2d 768 (La.1980). The *191 present Civil Service rules promulgated by the Commission regarding the establishment of a uniform pay plan provide that the Director, after consulting with the appropriate officials and conducting such investigations as he deems necessary, shall submit to the Commission a uniform pay plan or amendments thereto regulating the compensation of all classified employees. Any pay plan or amendment thereto must be submitted to the Commission at a public hearing for its consideration. A pay plan only becomes effective when approved by the Governor in its entirety. The various rates within each classification are adopted by the Commission and approved by the Governor.[7]
Any uniform pay plan established and implemented by the Commission must conform to the basic purposes for which our Civil Service System was created. The purposes behind our Civil Service System have been elaborated upon many times by the courts of this State. In the context of this historical synopsis, we find it noteworthy to mention them again. The Louisiana Supreme Court recently commented in New-Orleans, Etc. v. Civ. Service, Etc., 422 So.2d 402 (La.1982):
The fundamental purpose of civil service laws and rules is to establish a merit system for selecting non-policy forming public employees on the basis of merit and providing that they can be discharged only for insubordination, incompetency, or improper conduct, and not for religious or political reasons. 3 C.E. Dunbar, Jr., Project of a Constitution for State of Louisiana 500 (1954). State ex rel Murtagh v. Dept. of City Civil Service, 215 La. 1007, 42 So.2d 65 (1949). Perkins v. Director of Personnel, 220 So.2d 253, 256 (La.App. 1st Cir.1969). Civil service is designed to abrogate the "spoils system" under which public employees are not selected for employment and promotion on the basis of merit or qualifications for the position but as rewards for faithful political activity and service, so that the job holders and their families become economic slaves of a particular political organization and have to vote and work for the candidates of their faction regardless of the character or qualifications of the candidates. Dunbar supra at 500. State ex rel. Boucher v. Heard, 228 La. 1978, 84 So.2d 827, 830 (1955). The routine operation of a civil service system by merit selection, compensation regulation, and tenure protection serves to promote efficiency by abolishing useless and unnecessary jobs, maximizing the resources invested in employees by long service, and determining salary and length of service on the basis of benefits rendered to the people rather than to the victorious party. Dunbar, supra, at 502. Vidrine v. State Parks and Recreation Commission, 169 So.2d 641, 645 (La.App. 1st Cir.1964).

*192 Because of the peculiar history of civil service in Louisiana, the inclusion of detailed provisions on civil service in the constitution contrary to the principles of a brief charter has been deemed necessary by legal scholars. Dunbar, supra p. 499. A self-operative merit system established in the constitution so that it can be repealed or amended only by a vote of the people has been deemed essential to the protection of civil service against repeal or weakening amendments and sabotage by a temporary majority vote of a spoils-minded and partisan legislative faction. Dunbar, supra, at 501.
422 So.2d at 410
In Barnett v. Develle, 289 So.2d 129 (La. 1974), the Louisiana Supreme Court stated:
The patent purpose of Section 15 is to insure uniform treatment of all similarly classified employees in the State and municipal civil service systems provided for therein. To avoid discrimination and favoritism, to promote efficiency of governmental operation, and to encourage promotion based on merit, the electorate, by adoption of Section 15, has placed certain aspects of State and municipal classified employment beyond the pale of state and local governmental control.
289 So.2d at 143
And finally, in Louisiana Civil Service League v. Forbes, supra, the Louisiana Supreme Court summarized:
Civil Service Statutes are designed to secure adequate protection to public career employees from political discrimination. State ex rel. Murtagh v. Dept. of City Civil Service, 215 La. 1007, 42 So.2d 65. They embrace the merit system, and their intent is to preclude favoritism. Louisiana's Civil Service System is set forth in Art. XIV, Sec. 15, La.Const. of 1921. It provides among many things for promotions, lay-offs, discrimination, political activities, fraud, violations, and disciplinary action. It also sets forth a method of appeal and judicial review." Womack v. Louisiana Com'n on Governmental Ethics, 250 La. 833, 199 So.2d 891, 897 (1967). The purpose of civil service laws is to guarantee the independent security and welfare of public service. State ex rel. Boucher v. Heard, 228 La. 1078, 84 So.2d 827. "The purpose of the Amendment is to insure efficiency in governmental operations by providing security of employment thus enabling the state to take advantage and reap the benefits of experience gained by those employees of long service." Vidrine v. State Parks and Recreation Commission, La.App., 169 So.2d 641, 645 (1965). "The purpose of the Civil Service Amendment is to secure governmental employees in their positions, free from discrimination of political, religious or other nature." Perkins v. Director of Personnel, La.App., 220 So.2d 253, 256 (1969).
246 So.2d at 807
Lastly, we note that the 1973 Convention debates reaffirmed the notion of a Civil Service System based on merit. Therefore, it is against this historical backdrop and with these fundamental purposes in mind, that we must consider the issues before us.
ISSUE ONE: PARITY
Before addressing the merits of plaintiffs' contentions concerning the constitutionality of the Governor's orders, minimum implementation, and the subsequent unequal implementation of the Plan between departments, we turn our attention to plaintiffs' argument concerning parity. Plaintiffs first allege that they should have been granted parity in the 1975 classification system with Engineers III, before DOTD applied the limited fiscal measures imposed by the Governor. The record contains numerous documents and correspondence which support plaintiffs' contention.
The 1975 Pay Plan, itself, provided identical pay ranges for these two groups of employees.[8] The obvious intent of the Commission at the time the Plan was established was to grant plaintiffs parity with *193 Engineers III. The Commission's opinion admits:
"During the preparation of the Pay Plan revisions for submission to the Governor in 1975, the class Engineering Specialists III was given the same pay range as Engineers III via a special upward pay adjustment."
Also, in briefs before us, counsel for the Department of Civil Service has never seriously questioned plaintiffs' entitlement to parity on August 2, 1975, but rather, insists that the Governor's orders were responsible for parity being lost.[9]
The history of these two groups prior to 1975, as alleged by plaintiffs, was never questioned by appellee. In 1965, when the classification of Engineer Specialist III was first established, it was on an equal pay scale with Engineer III. The job descriptions for the two groups are virtually the same. From 1965 to 1970, this equality remained intact. However, through various pay increases from 1970-1975, the pay range for Engineer III somehow got ahead of Engineer Specialist III. Engineer Specialists III complained from the beginning, and discussed the problem with various officials soliciting their support to have parity restored. Officials of the Department of Civil Service assured Engineer Specialists III that their request would be seriously considered.[10] We find particularly pertinent a letter from Harold E. Forbes, Director of the Department of Civil Service, dated November 15, 1974, to Representative Richard H. Baker. Forbes promised "consideration" of a pay adjustment for the class of Engineer Specialist III. The contents of this letter are very enlightening as to the real heart of this controversy:
"Over the past several years, a shortage of professional engineers made it mandatory to utilize high caliber subprofessional engineering personnel to the greatest extent possible to somewhat alleviate this serious situation. It soon became evident that for all practical purposes, the professional classes of Engineer I, II, and III could be abolished and the work concepts could be incorporated, except for the elements requiring professional capabilities, in the new classes of Engineering Specialist I, II, and III, using appropriate options such as inspection, survey, construction, etc. because of the necessary narrowing of work into specialty categories at the subprofessional engineering level. Accordingly, the class of Engineer IV was intended to constitute the first level of professional engineering in the State Classification and Pay Plan.
Immediate objections were received, however, when an effort was made to abolish the class of Engineer III. These objections came primarily from "Dollar License Engineers" who had received their professional status only through special legislative enactments and not through established academic and experience requirements imposed by the State Board of Professional Engineers and Land Surveyors. As a result, the class of *194 Engineer III, which the class of Engineering Specialist III was intended to replace, was retained with reluctance. Now as to equity of pay ranges between a professional class on the one hand (i.e. Engineer III) requiring a license and an advanced subprofessional class on the other (i.e. Engineering Specialist III) not requiring a license, a pay range differential has evolved which in essence is only one step apart. We feel that this slight differential is proper. Also, since promotion to Engineering Specialist III is practically automatic after one year's service in the grade of Engineering Specialist II, there are no recruiting problems for Engineering Specialist III positions nor has there been any significant problem in retaining employees at this level."
This letter disturbs us because one of the primary purposes of Civil Service is the establishment of a merit system which was to be non-political and free from pressure tactics. On November 20, 1974, the Board of Highways of the Louisiana Department of Highways (predecessor of DOTD) passed a Resolution which contained the following language:
"WHEREAS, in establishing the position of Engineering Specialist III, many years ago, it was intended that the personnel holding this classification be paid on a basis equivalent to the personnel holding positions of Engineer III, and
WHEREAS, in the intervening years since the establishment of the class of Engineering Specialist III, changes in the pay scales of the two classes of Engineering Specialist III and Engineer III have not kept pace with each other and the pay scale of the Engineering Specialist III class has fallen behind that of the Engineer III class, and
WHEREAS, the two classes should have identical pay scales as was originally intended,
THEREFORE, BE IT RESOLVED by the Board of Highways of the State of Louisiana that it recommend and request that the Department of Civil Service present to the Civil Service Commission a revision in the pay scale of the Engineering Specialist III class to re-establish the class at the same scale as that authorized for the Engineer III class, and
BE IT FURTHER RESOLVED that the Louisiana Civil Service Commission be and it is hereby requested to approve a revision in the pay scale of the Engineering Specialist III class to render that scale identical with the pay scale of the Engineer III class, as was the original intent."
In 1975, the Pay Plan was submitted to the Governor with the pay scales of the two classes being made identical.
Subsequent developments since 1975 also support plaintiffs' contention that they suffered a particular injustice in being denied parity. The Commission met on September 5, 1979, and received a presentation by Engineer Specialists III.[11] An excerpt from the Commission's minutes states that the Commission instructed the Director of the Department of Civil Service, Engineer Specialists III, and their counsel, to consult with representatives of DOTD, "... in order to formulate a proposal to be presented to the Civil Service Commission at a later date that would alleviate the injustices to Engineer Specialists III...." [Emphasis ours] House Concurrent Resolution 242 was passed by the 1980 Regular Session of the Legislature, wherein the Legislature recognized that the Engineer Specialists III were not given the same bracketed adjustments as Engineers III in the 1975 Pay Plan, but rather, were removed from the rank they held and were placed in lower steps. The Legislature urged the Commission and the Department of Civil Service to take immediate action to correct this injustice, and further empowered the Speaker of the House of Representatives to set up an investigating committee to research the *195 matter and to assist in effectuating the purposes of the Resolution.[12]
Lastly, the record contains a letter from Anthony J. Bonfanti, Executive Assistant General Counsel of the DOTD, to Ms. Delmar Fulmer, a research analyst at the Louisiana State Senate, dated April 8, 1981.[13] After discussing other cases involving alleged inequitable treatment of DOTD employees, Bonfanti states:
"Whereas I wish to make it perfectly clear that given the funds by the Legislature to correct inequities and given the proper vehicle whereby such action by this Department would be approved or accepted by Civil Service, this Department is perfectly willing to take corrective action but it nevertheless was hindered in the past by advice received from Civil Service itself. Additionally, we wish to make it clear that we do recognize the inequity that exists with the Engineering Specialists in the present situation, since the 1975 pay plan included a Range Change for them to bring said Engineering Specialists III up to the salary of Engineer III thus the partial implementation effectively negated the Range Change. However, it is a matter of degree since all employees of the Department of Transportation and Development in practically every case with regard to the 1975 pay change suffered a loss in steps under the new pay plan because of the partial implementation. Nevertheless, the Department admits that the Engineering Specialists III lost more by the partial implementation which could have been corrected by full implementation." [Emphasis ours]
It is a fundamental notion that employees who perform equal work should receive equal pay. This was clear to the delegates to the Constitutional Convention of 1973.[14] The record in this case is equally clear. The record fully substantiates plaintiffs' contention that everyone concerned intended the pay scales of Engineer Specialists III and Engineers III to be identical. The only reason parity was not achieved was because of the manner in which the Governor's orders were implemented. We do not believe the Governor intended by his fiscal measures to destroy the parity provided by the Plan and intended by the Commission between these two groups.[15] Engineer Specialists *196 III should have first been granted parity with Engineers III before there was any actual implementation. However, approximately eight years have passed since this plan was minimally implemented, so this case can no longer be approached from the narrow issue of parity; the results of minimum implementation must be addressed.[16]
ISSUE TWO: THE CONSTITUTIONALITY OF MINIMUM IMPLEMENTATION OF THE 1975 PAY PLAN
A. GOVERNOR'S ORDERS
Plaintiffs challenge the constitutionality of the Governor's actions in modifying the 1975 Pay Plan, by issuing orders on how the Plan was to be implemented. The record contains a copy of the State Personnel Manual Transmittal Sheet No. 169, which contains the instructions ordered by the Governor. It reads in part:
"TO: HEADS OF STATE AGENCIES AND PERSONNEL OFFICERS
Attached hereto is a revision of Part 6, `Pay Plan and Class Specification Index', of the State Personnel Manual. These changes are effective August 2, 1975.
The Civil Service Commission and the Governor have approved an increase in the pay range for each class of position. However, the amount of money appropriated to implement the plan precludes the placing of each employee's salary on the corresponding step of the new pay range as has usually been the case. Accordingly, the Governor has issued the following instructions concerning implementation." [Emphasis ours][17]
The Commission's opinion states:
"Due to fiscal limitations, the Governor ordered that the pay plan be implemented only under certain conditions. The condition that is relevant here was that in the case of those classes that were to receive special pay adjustments, as Engineering Specialists III, the implementation was to be limited to an increase from present salary not to exceed two and one-half steps. That is, by order of the Governor, appointing authorities were prevented from moving members of a class receiving a special pay adjustment to the same step in the new pay range as they had occupied in the old if that move to the same step resulted in a salary level greater than two and one half step increases. That pay plan became effective on August 2, 1975.
By an appeal docketed as No. 2404, appellants, all Engineering Specialists III, sought an order from this Commission granting them step increases to which they felt entitled but were denied as a result of the implementation in accordance with the Governor's orders." [Emphasis ours]
These two documents clearly show that the Commission felt bound to implement its established Pay Plan, only in accordance with the modification ordered by the Governor.
*197 The Louisiana Constitution of 1974, Article 10, Section 10, does not mention the involvement of the Governor in the Commission's establishment of a uniform pay plan. The predecessor article of this section, La.Const. of 1921, Art. 14, Sec. 15(I)(c), quoted earlier in this opinion, does state that the Pay Plan "shall become effective only after approval of the Governor." Civil Service Rule 6.2 provides that a pay plan shall not become effective until approved by the Governor in its entirety.[18]
This power of approval was discussed by the delegates at the 1973 Constitutional Convention. The record of those debates reveals that this power of approval was not contemplated to include the right to amend or modify a pay plan, but merely to approve or disapprove it.[19] This conclusion is further supported by our jurisprudence. In Louisiana Civil Service League v. Forbes, supra, the Louisiana Supreme Court stated:
"Further, it is the opinion of this court that the mandate of the people evidenced a clear intent, as reflected by their constitution, to invest the State Civil Service Commission with the sole and exclusive authority to establish all rates of compensation paid to Civil Service personnel, subject only to the routine approval of the Governor of this State." [Emphasis ours]
246 So.2d at 808. *198 In Barnett v. Develle, supra, decided by the Louisiana Supreme Court under the 1921 Constitution, the City Council of New Orleans had passed acts regulating the salaries and vacation time of firemen. The City Civil Service Commission filed suit to enjoin the disbursements of these funds, as violative of the Constitutional mandate that the Commission establish classifications and rates of pay for Civil Service employees.[20] In Barnett, the court stated:
"We agree that Section 15 vests the Commission with the same authority regarding pay schedules for City Classified Employees as it does the State Civil Service Commission with regard to pay schedules for State Classified Employees. We are also of the view that Forbes correctly held no pay plan can be approved by the State contrary to one established by the State Civil Service Commission, notwithstanding such a plan does not become effective for the State until approved by the Governor. That the Governor must approve a State plan, and the City approve a City plan before either can become effective, does not diminish or detract from the authority of the State or City Commission to adopt and enforce such plans. Neither does it mean that either the State or City can implement such a plan contrary to one recommended and established by the State or City Commission. Where such plans have been established, as is the case here, neither the State nor City can approve or implement a contradictory schedule."
289 So.2d at 143
And further,
"We held in Forbes that, with regard to State Employees, the authority of the State Commission is ultimate despite the need for approval by the Governor." [Emphasis ours]
289 So.2d at 145
Civil Serv. Com'n, Etc. v. Rochon, 374 So.2d 164 (La.App. 4th Cir.1979), was the predecessor suit to New Orleans Firefighters Association, et al., supra, where the City Civil Service Commission sued to enjoin the Chief Administrative Officer from independently authorizing the addition of State supplemental payments to the regular salary of employees, in computing overtime.[21] The court in Rochon, supra, held that the chief administrative officer had no authority under law to independently alter methods of compensation and disbursements to Civil Service employees of the City as set by the Commission. The court stated:
"The Commission alone has the authority to set compensation in the form of salaries, including overtime, of city employees with civil service status. To allow the city to ignore the Commission and independently set the amount of overtime pay, as it does in this case, because it believes, rightly or wrongly, that the Commission is legally mandated to use the amount thus set by the city, would have the effect of eroding, or possibly even destroying, the constitutional and exclusive authority of the Commission in the area of compensation for civil service employees."
374 So.2d at 167.
Finally, the Louisiana Supreme Court recently stated in New Orleans Firefighters Association, et al., supra:

*199 "Devising a pay plan is a task more appropriate for a quasi-judicial body such as the civil service commission which is capable of weighing the equities and considerations of fairness among different classifications of employees with respect to compensation and promotion."
422 So.2d at 411.
Lastly, we note that Civil Service Rule 6.2 provides for approval by the Governor of a pay plan "in its entirety." To allow the Governor to approve a plan in less than its entirety, would circumvent the Commission's ultimate authority to establish "a comprehensive and unified [personnel] plan for all state employees." Louisiana Civil Service League v. Forbes, supra, at p. 808. We hold that Civil Service Rule 6.2, following the intent of the Constitution with regard to the Governor's approval, requires said approval to be of the entire Plan.
Therefore, we hold that there is no authorization in the Constitution, jurisprudence, or Civil Service rules of this State, which would authorize the Governor to modify or amend any Uniform Pay Plan recommended and established by the Commission. His authority is that of approval or disapproval of a plan, in its entirety. If the Governor chooses not to approve a plan, the proper recourse is to send the plan back to the Commission for its modification, in line with the purposes and intent of its Constitutional mandate.
B. MINIMUM IMPLEMENTATION
Although we have found the Governor's orders unconstitutional, it is necessary also to address the issue of whether the actual effects of minimum implementation were constitutional. Initially, we observe that the Commission felt bound to follow the Governor's orders, as the Department of Civil Service has disputed plaintiff's claim to parity on the grounds that the Commission was simply following said orders. Further, the Department of Civil Service has continually defended the actions of the Governor and asserts that his orders were not inconsistent with any of the Civil Service rules, but rather consistent with Rule 6.12[22] However, counsel for appellee admitted in a synopsis prepared for the Commission[23] that minimum implementation in accordance with this rule is inequitable and further recommended that Rule 6.12 be amended or that minimum implementation as such be precluded.
We agree with plaintiffs that the Commission has a Constitutional trust to establish and implement a uniform pay plan. The Commission alone may modify or amend said plan. Assuming the Commission, by implementing the Governor's orders, tacitly approved his modification of the plan as consistent with Rule 6.12, we now address the constitutionality of that implementation.
First, we examine the actual effects of minimum implementation with regard to plaintiffs herein. In the aforesaid synopsis presented to the Commission, the effects of minimum implementation, with regard to Engineer Specialists III, were admitted as follows:
"1) Although the pay range for Engineering Specialists III was made equal to the pay range for Engineers III, an Engineering Specialist III with 5 years service found himself making less than an Engineer III with 5 years experience.
2) Anyone appointed or promoted to the class of Engineering Specialist III after August 2, 1975, got full benefit of the new pay range. Thus, an Engineering Specialist II on the maximum who was promoted to Engineering Specialist III on August 3, 1975, would have been put on the 6th step, although an Engineering Specialist III who had been serving in that capacity for 9 ½ years would only be on the 3rd step. Thus, someone with no experience as an Engineering Specialist III would earn more than an Engineering Specialist III with 9½ years experience.

*200 3) Engineers III lost a maximum of 4 steps whereas Engineering Specialists III lost a maximum of 7 steps.
4) Engineering Specialists III who were affected by minimum implementation of the August 1975 pay plan ultimately have to work in that capacity for 16½ years to reach the maximum of the pay range, whereas Engineering Specialists III who were not affected by minimum implementation of the August 1975 pay plan will only have to work 9½ years to reach the maximum pay.
5) Engineering Specialists III who are ready to retire will not receive the maximum retirement benefits they would have received had the August 1975 pay plan been fully implemented.
6) Life insurance benefits, (which are available at 1½ times an employee's salary) are not as high as would have been available had the August 1975 pay plan been fully implemented.
Only the first consequence listed above is uniquely applicable to the Engineering Specialists III. The whole purpose for changing the range of Engineering Specialist III was to make it identical to the pay range for Engineer III since the two classes had similar duties and qualifications. Due to minimum implementation, this equality existed only for Engineering Specialists III appointed after August 2, 1975. The remaining consequences listed above will occur any time a pay plan is minimally implemented."
At the conclusion of the synopsis, counsel further admitted:
"There is no question that certain pay inequities occur if a pay plan is minimally implemented. These inequities stem from the provisions of Rule 6.12. Under Rule 6.12, if a pay range is changed, an employee earning less than the minimum must be increased to the minimum. Thus, an employee who has less than six months of service will receive 100% of the benefit of the pay range change. However, an employee with 9½ or more years of service in his position will receive the least possible benefit of the pay range change. Essentially, Rule 6.12 is to the advantage of employees who have given the state the shortest period of service. Unfortunately, unless a pay plan is fully implemented, the pay inequities that result from minimum implementation are never rectified. Therefore, regardless of how the Commission elects to resolve this matter, serious onsideration (sic) should be given to amending Rule 6.12 to either provide for minimum implementation in a more equitable manner or to preclude minimum implementation." [Emphasis ours]
And finally, in a report on the effects of minimum implementation, prepared for the Investigative Committee of the Legislature, created pursuant to House Concurrent Resolution 242, mentioned earlier, appellee's counsel stated:
"Thus, the higher the step the employee was on, the greater impact minimum implementation had on the employee. Whereas, the average state employee received 5.8% less of an increase than was anticipated because of minimum implementation, the Engineering Specialists III between the 5th step and the maximum of their pay range received from 23.4% to 39.0% less of an increase than was anticipated. Essentially, the Engineering Specialists III between the 5th step and the maximum of their pay range received the benefit of the general pay increase but did not receive the benefit of the special pay adjustment."
Although plaintiffs complained about the effects of minimum implementation, it is especially significant that appellee was so cognizant of the problems involved therewith. As stated earlier, however, the Commission felt mandated to so implement the plan according to the Governor's orders. In sum, minimum implementation resulted in the following: (1) loss of parity for Engineer Specialists III with Engineers III; (2) loss of an intended pay increase; (3) Engineer Specialists III were reduced in steps which resulted in a loss of earned seniority and rate of advancement in the system, while persons with less seniority reaped the full benefits of the Plan; (4) the dissection *201 of the classification of Engineer Specialist III into those who were demoted in steps under the Plan, those who achieved this status after August 2, 1975, who obtained the full benefits of the Plan as to parity, and even a third group, who were in Steps 1-4 on the effective date of the Plan, who also were granted parity.
The most glaring injustice from minimum implementation is the fact that persons with the least time in the system reap full benefits, while long service employees are reduced in steps and at the same time deprived of those benefits which others are receiving. This result runs directly in conflict with the notion of a merit system. As mentioned in New Orleans Firefighters Association, et al., supra, one of the purposes of civil service is that of "maximizing the resources invested in employees by long service." And again, in Louisiana Civil Service League v. Forbes, supra, the Louisiana Supreme Court, in discussing the very purpose of the Civil Service Amendment stated:
"The purpose of civil service laws is to guarantee the independent security and welfare of public service. State ex rel. Boucher v. Heard, 228 La. 1078, 84 So.2d 827. `The purpose of the Amendment is to insure efficiency in governmental operations by providing security of employment thus enabling the state to take advantage and reap the benefits of experience gained by those employees of long service.' Vidrine v. State Parks and Recreation Commission, La.App., 169 So.2d 641, 645 (1965)." [Emphasis ours]
246 So.2d at 807
Civil Service was designed to preclude favoritism; and minimum implementation which grants 100% benefit of a plan to employees with the least service, while denying such to long service employees, certainly favors the former group over the latter.
The Plan, as implemented, also divided the class of Engineer Specialist III, by allowing employees who were in the first four Steps and those who came into the class after August 2, 1975, to be treated differently than plaintiffs, who occupied the class at the time of implementation. This dissection is contrary to the notion of uniformity, which is a fundamental characteristic of a constitutional pay plan.
Additionally, we note that an attempt was made by Delegate Jenkins to have the term "length of service" substituted by the term "experience" in La. Const. Art. 10, Sec. 7, which provides in part:
"Permanent appointments and promotions in the classified state and city service shall be made ... under a general system based upon merit, efficiency, fitness, and length of service, ..."
The amendment was rejected, as other delegates supported the principle of giving consideration in promotions for dedication and long term service in State employment. It was felt that this was one incentive for these employees to remain in the State employment.[24] Minimum implementation, in the manner outlined above, does not take into account merit, efficiency, fitness, or length of service, when detailing which employees receive maximum benefits. Instead, *202 as in the case of plaintiffs, it demoted in steps and reduced the benefits of longer service employees with more experience.
Appellee contends that the Commission was correct in classifying these inequities suffered by plaintiffs, as resulting simply from the "mechanics of the system" pursuant to our decision in Hollingsworth v. State Through Dept., Etc., supra. Plaintiff in Hollingsworth was a State Police Commander Inspector, serving with permanent status, who alleged discrimination in the application of the same pay plan now before us. Hollingsworth alleged discrimination on the basis that two compatible officers were receiving slightly more pay, although junior to him in service and although he had served in higher classes of position than they. The record showed that these two officers had vertically progressed in the classification system in the following manner:
... at the time when the pay plan went into effect each of them held a lower rank than Hollingsworth, but they obtained a discretionary merit step increase in pay in the lower rank prior to their promotions and the accompanying salary increases. The record also shows that when the two other employees moved from State Police Captain to the new class of State Police Commander, the two-step increases made it possible for them to receive more pay than Hollingsworth, who was already a Commander Inspector."
354 So.2d at 1059
These officers were first promoted in the lower rank on the basis of merit and then received the benefit of the Pay Plan. In the present case, plaintiffs allege they were unjustly deprived of parity with another classification, and also were prejudiced by the minimum implementation of the Plan. Their complaints are founded somewhat in discrimination based on unfair vertical progression of other employees, but instead of meritorious progression, as in Hollingsworth, plaintiffs complain of arbitrary vertical progression based on a division of their class and a denial of parity. Also, plaintiffs' complaints herein are much more far reaching, in that they further challenge discrimination on a "horizontal" sphere in the various classifications and pay schedules in the system, based on a subsequent unequal implementation of the Plan between departments.[25] The inequities revealed in the record before us cannot be characterized as a result of the "mechanics of the system." Thus, Hollingsworth is inapposite on its facts and easily distinguishable from the present case.
Therefore, we hold that the Commission has a Constitutional trust to establish and implement a uniform classification and pay plan as a non-political body. This trust may not be circumvented by submission to Governor's orders which are not in keeping with said mandate. The proper action for the Commission to have taken was to have received the Plan from the Governor, and then to have revised the entire Plan to effectuate an equitable distribution among all classified employees in accordance with the basic purposes of a merit system. The plan should have then been resubmitted for the Governor's approval. Further, Civil Service Rule 6.12 (present Rule 6.28), which allowed implementation of a pay plan in the manner discussed, is unconstitutional as violative of the basic premises of a merit system. We conclude that the partial implementation of the 1975 Pay Plan was unconstitutional and in violation of the basic ideals and purposes for which our Civil Service System was created.
ISSUE THREE: THE CONSTITUTIONALITY OF UNEQUAL IMPLEMENTATION OF THE 1975 PAY PLAN BETWEEN VARIOUS DEPARTMENTS
It was admitted by the Commission in its opinion that the three largest departments of the State never fully implemented the August 2, 1975, Pay Plan. Counsel for appellee outlined the unequal implementation *203 of the Plan for the Legislative Committee in May of 1981. The report to that Committee reveals that eight departments were finally able to give full implementation to the Plan, while six departments (including DOTD) were never able to do so. The report contained the following:

"IMPLEMENTATION BY OTHER DEPARTMENTS
According to information provided by the various personnel officers, the following departments were eventually able to give full implementation to the August 2, 1975 pay plan:
Department of State Civil Service
Department of Commerce
Department of Education
Department of Insurance
Department of Labor
Department of Public Safety
Department of Wildlife and Fisheries
Department of State
The following departments made no additional adjustments and never fully implemented the August 2, 1975 pay plan:
Department of Agriculture
Department of Corrections
Department of Culture, Recreation & Tourism
Department of Health and Human Resources
Department of Transportation and Development
The Department of Revenue and Taxation made some pay adjustments but never fully implemented the August 2, 1975 pay plan.
During 1975, the executive branch was undergoing reorganization. Therefore, the departments listed above did not necessarily include all of the state agencies they currently include. However, this implementation gives a general idea of the extent to which the August 2, 1975 pay plan was eventually fully implemented. Although the majority of the departments were able to fully implement the August 2, 1975 pay plan, the three largest departments were not able to do so. Because the three largest departments employ over half the state employees, the majority of state employees have not received the benefit of full implementation of the August 2, 1975 pay plan."
Plaintiffs challenge the unequal implementation between departments, as violative of the Constitutional mandate for a "uniform" pay plan. The Constitution of 1921 in Article 14, Sec. 15, described a uniform plan as one:
"... requiring the classification of positions in the classified service according to similarity of duties performed and responsibilities assumed, so that the same qualifications may reasonably be required for, and the same schedule of pay may be equitably applied to all positions in the same class."
And in Article 14, Sec. 15, it further stated:
"Each employee shall be paid at one of the rates set forth in the pay plan for the class of position in which he is employed."
The debates at the Constitutional Convention of 1973 reveal that it was the desire of the delegates and those involved with Civil Service at that time to maintain the establishment of a uniform pay plan in the 1974 Constitution. Further, it was also the intent of the framers that this Plan would continue the principle of keeping individuals in the same classification "on par" as to salaries, unless there was a proper basis for differentiation.[26]
In Sewerage and Water Bd. of New Orleans v. Barnett, 225 So.2d 381 (La.App. 4th Cir.1969), the Sewerage Board, operating on dedicated funds, gained approval by the City Council, of a revised pay plan established by the City Civil Service Commission, insofar as the Pay Plan applied to its employees. The City Council, however, did not approve the rest of the Plan for the other classified employees. The Commission refused *204 to implement the plan just with regard to the Sewerage Board employees and the Board sought a mandamus ordering the Commission to do so. In denying the mandamus, the court stated:
"Under the above quoted constitutional provisions it is clear that all employees covered by Civil Service of the City of New Orleans, and this includes Sewerage and Water Board employees who are so protected, must be paid according to one uniform pay plan so that ` * * * the same schedule of pay may be equitably applied to all positions in the same class.' To paraphrase a portion of the excellent reasons for judgment given by the trial judge: A major intent and purpose of Civil Service is to insure uniformity among employees covered thereby, to the end that such employees in a particular class will enjoy equal and uniform rights with others in the same class regardless of the department, agency, board or commission in which they may be employed. To permit employees of one department, agency, board or commission to receive a pay raise while other employees in other departments, agencies, boards or commissions, similarly classified and under the same Civil Service, receive a lower rate of pay does violence to that major intent and purpose of Civil Service. Neither the fact that the Board has sufficient funds to pay the proposed wage increases, nor the fact that the City is financially unable to do so, changes the law as written." [Emphasis ours]
225 So.2d at 384
In Louisiana Civil Service League v. Forbes, supra, the Louisiana Supreme Court stated:
"There is no question that the intention at that time was to create an independent and autonomous agency of state government, normally free of otherwise disruptive political influences, and one which would establish a comprehensive and unified [personnel] plan for all state employees, including the adoption of rules regulating the classification of jobs and fixing of rates of compensation." [Emphasis ours]
246 So.2d at 808
The intent of the 1921 Constitution, the framers of the 1974 Constitution, and our jurisprudence has been to have the same schedule of pay for members of the same class. Nowhere do we find authority for allowing variations in pay schedules between employees in the same classification, simply because they are employed in different departments. This notion violates the Constitutional establishment of a unified and comprehensive classification and pay plan.
Appellee contends that Civil Service Rule 6.12 was enacted by the Commission to provide the various departments with alternative means of implementing a pay plan, to the extent their budgets will permit; that only the Commission may establish a plan, yet only the Legislature can appropriate the funds for implementation; that the departments must pay their employees according to the schedule established by the Commission, yet they cannot exceed their budgets; and that Rule 6.12 provides the flexibility needed in the system among these various factors.
Appellee has misplaced the appropriate avenue for flexibility, as such was provided by the framers of our Constitution. Our Supreme Court has firmly stated that the ultimate authority for the compensation of classified employees is vested in the Commission, and it is the Commission which has the exclusive authority to establish and implement a pay plan. Louisiana Civil Service League v. Forbes, supra. Once the Commission establishes a plan, and it is approved by the Governor, it has the effect of law. The approval of the Governor is the safeguard on the Commission's plan, and also provides the flexibility needed in the system, as the Governor should not approve a plan unless the Legislature has appropriated sufficient funds for its implementation.[27] Again, if the Governor disapproves the Plan, it should be sent back to the Commission for a revision which provides for an equitable distribution among all classified servants. This procedure protects *205 the integrity of the Commission as a non-political body. This constitutional duty may not be delegated to the various departments, as then the departments and not the Commission would be establishing a plan. Rule 6.12, as interpreted by the Commission to allow such, is unconstitutional. The departments should implement in accordance with the Commission's Plan. They cannot be permitted to individually implement the Plan in various degrees. To allow such directly conflicts with the concept of a uniform pay and classification plan for all State civil employees, regardless of the department in which they are employed.[28]
We hold, therefore, that the action of the Commission, subsequent to the effective date of the 1975 Pay Plan, which allowed various departments within the Civil Service System to fully implement the Plan, while other departments, notably DOTD, were not able to do so, is violative of its Constitutional trust to establish a uniform classification and pay plan for all civil service employees of this State.
CONCLUSION
Originally, plaintiffs' demand was fairly simple: They sought parity, i.e., equal treatment with Engineers III. The failure to grant parity combined with minimum implementation for approximately eight years, and subsequent unequal implementation between departments, has resulted in the complex problems which we have been required to address in this case. These issues could not be properly resolved without an overview of the history and purposes of civil service, which is necessary for a proper understanding of the totality of this case. For all of the foregoing reasons, we hold that minimum implementation of the 1975 Pay Plan, the subsequent unequal implementation between different departments throughout the State system, and Rule 6.12 as interpreted to allow either, are unconstitutional; and the decision of the Commission is reversed. This case is remanded to the Commission, with orders to conduct further proceedings consistent with this opinion which will revise its Pay Plan to effectuate: (1) parity between the Engineer Specialists III and Engineers III, and (2) fully implement said plan as to employees in those departments, which have not fully implemented, all as the Constitution of this State requires. All costs[29] of this appeal are taxed to appellee.
REVERSED AND REMANDED.
PER CURIAM.
The Department's application for rehearing is denied. In its application, the Department *206 additionally seeks clarification of our order.
We note that nowhere in our opinion do we state that our decision is to apply retroactively. This decision is inappropriate for retroactive effect. Chevron Oil Company v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); Succession of Clivens, on rehearing, 426 So.2d 585 (La.1983); Lovell v. Lovell, 378 So.2d 418 (La.1979); and Stafford v. Division of Administration, 407 So.2d 87 (La.App. 1st Cir.1981). However, plaintiffs herein, are entitled to parity with Engineers III as of August 2, 1975. The remainder of our decree is to have prospective effect as follows: to order the Commission to fully implement the 1975 Pay Plan, as of the date of this decision, as to all departments within the system which have, as yet, not fully implemented; to prevent further minimum implementation of any pay plan in the manner outlined in our opinion; and finally, to create uniformity of pay as to all employees in the same classification, regardless of the department or agency in which they are employed.
SHORTESS, Judge.

DECLINATORY EXCEPTION TO SUBJECT MATTER JURISDICTION
Along with its application for a rehearing, the Department of State Civil Service (Department) filed a declinatory exception on March 24, 1983, challenging this court's subject matter jurisdiction in the present case. In Thoreson v. State Dept. of Civil Service, 396 So.2d 367 (La.App. 1st Cir.1981), we held that the judicial jurisdiction of the Civil Service Commission (Commission) is restricted to removal, disciplinary and discrimination cases. However, we stated that the Commission also had jurisdiction to entertain appeals under its legislative and executive powers. La. Const.1974, article 10, section 10. As this appeal was then heard by the Commission, on remand, under its executive and legislative powers, the Department maintains that this court is without jurisdiction to hear and decide an appeal therefrom. The Department contends that our jurisdiction is limited to appeals stemming from the judicial power of the Commission.
The court in the first Thoreson decision, supra, strictly dealt with the Constitutional provisions governing the Commission's jurisdiction. La. Const.1974, article 10, sections 8 and 12. The court did not address the power vested in the Commission by virtue of its own rules.
An employee who has been subjected to disciplinary action, or discriminated against on the basis of race, sex, politics, or religion, is given the right to appeal to the Commission, by virtue of La. Const.1974, article 10, section 8.[1] Additionally, Civil Service Rule 2.9(f) reads as follows:
"The Commission is empowered:
. . . . .
(f) To hear appeals from employees and others who claim their rights under these Rules and the Civil Service Article have been violated and to issue appropriate orders in such cases."
In its first written decision in this protracted litigation, the Commission commented:
"The grant of appellate jurisdiction in Article X, Section 12 of the Constitution of the State of Louisiana has been refined by the provisions of Chapter 13 of the Commission's Rules, governing appeals to the Commission."
*207 Civil Service Rule 13.10 is entitled, "Appeals to the Commission." Rule 13.10, subsection (a), traces La. Const.1974, article 10, section 8, and provides:
"An appeal may be made to this Commission by
(a) Any person in the Classified Service who alleges that he has been discriminated against or subjected to any disciplinary action because of his political or religious beliefs, sex or race."
Rule 13.10, subsections (b) through (1), additionally provide employees with the right to appeal discrimination, in practically any manner or form, and further clarify an employee's right to challenge disciplinary measures.[2] Discrimination is defined in Rule 1.14.1 as "consideration of religious or political beliefs, sex, race, or any other non-merit factors." [Emphasis ours.] Finally, Rule 13.10(e) provides:
"An appeal may be made to this Commission by
. . . . . .
(e) Any person in the Classified Service who alleges that he has been discriminated against by the application of the Pay Plan or by the application of any change thereof."
Civil Service rules have the effect of law. La. Const.1974, article 10, section 10(A)(4); Department of Health, Etc. v. Perry, 423 So.2d 1266 (La.App. 1st Cir.1982). If a rule is reasonable and not violative of basic constitutional rights, it must be recognized and given effect by the courts. Mayeaux v. Dept. of State Civil Service, 421 So.2d 948 (La.App. 1st Cir.1982); and Heinberg v. Department of Employment Security, 256 So.2d 747 (La.App. 1st Cir.1971), writ refused, 260 La. 1135, 258 So.2d 381 (1972).
*208 In its initial decision, the Commission felt that plaintiffs had "failed to cast their complaint within any of the constitutional or rule-made molds of Commission jurisdiction," citing La. Const.1974, article 10, section 12, and Rules 13.10(a)(b)(c)(h)(i) and (k). Our examination of plaintiffs' petition and complaint reveals that aside from authority to hear the complaint under its executive and legislative powers, the Commission, on original hearing, was vested with authority to hear the complaint under its judicial power by virtue of Rule 13.10(e).
Plaintiffs alleged that they were entitled to equal pay with another classification in civil service. Plaintiffs had been granted parity by the Commission in its establishment of the Pay Plan, as submitted to the Governor. It was only through the Governor's unconstitutional act in modifying the Plan, and subsequent unconstitutional minimum implementation that parity was lost. Further, plaintiffs challenged discrimination among members of the same class, as they alleged that certain members were receiving full benefit of the Plan, while they, with more seniority, were receiving only a small benefit. See Rule 13.10(e) and Mayeaux v. Dept. of State Civil Service, supra; and Clark v. Department of Transp. & Development, 413 So.2d 573 (La.App. 1st Cir.1982) esp. at footnote 4. Finally plaintiffs challenged discrimination among employees who were members of the same class, but employed by various departments throughout the State system. Clearly, these plaintiffs fall within the group envisioned by Rule 13.10(e), which grants a right of appeal to employees who allege that they have been "discriminated against by the application of the Pay Plan or by the application of any change thereof."
We note that our decision in Hollingsworth v. State Through Dept. Etc., 354 So.2d 1058 (La.App. 1st Cir.1977), writ denied, 356 So.2d 1010 (La.1978), is distinguishable only on its facts, but indistinguishable on the jurisdictional issue now before us. See Thoreson, et al. v. Department of Civil Service, et al., 433 So.2d 184 at pgs. 201-202 (La.App.1983).
La. Const.1974, article 10, section 12, provides in pertinent part:
"The final decision of the commission shall be subject to review on any question of law or fact upon appeal to the court of appeal wherein the commission is located...."
In Flores v. State Dept. of Civil Service, 308 So.2d 393 (La.App. 1st Cir.1975), a classified employee appealed to the Nineteenth Judicial District Court from a determination by the Commission that he was ineligible for veteran's pay under La. Const.1921, article 14, section 14(I)(9). The district court dismissed the action for lack of subject matter jurisdiction. We affirmed and held that the Administrative Procedures Act could not confer jurisdiction on the district courts to review decisions of the Commission. The Louisiana Supreme Court at 310 So.2d 855, 313 So.2d 842 (La.1975), denied writs in the case and in a memorandum opinion at 310 So.2d 855, commented:[3]
"Writ denied. La. Const. of 1921, art. 14, Section 15(O)(1) expressly provided that appeals from the civil service commission were to be taken to the appellate court. See also La. Const. of 1974, art. 10, Section 12. See Burton v. Department, 135 So.2d 588 (La.App. 1st Cir.) (1961), certiorari denied, Hughes v. Department, *209 131 So.2d 99 (La.App. 4th Cir.) (1961)."
We find that plaintiffs' complaints fell within Rule 13.10(e) and that the Commission was also empowered to hear their petition under its judicial power. Regardless, this court is empowered with full appellate jurisdiction to entertain an appeal therefrom.
Accordingly, the exception is denied.
DENIED.
NOTES
[1] Each employment position in the State Civil Service System is classified under a certain heading, i.e., Engineer Specialist III. The class is assigned a certain pay range, consisting of a maximum and minimum rate, with various intermediate rates. See: Civil Service Rule 6.3(a). These various rates of pay correlate with different "steps" within a class. An employee usually enters a class beginning on the lowest step and vertically progresses up the steps to the highest position and rate within a classification. Prior to the implementation of the 1975 Pay Plan, plaintiffs were those employees in the top five steps of the classification known as Engineer Specialist III.
[2] Civil Service Rule 6.12 was in effect at the time of the present action. It reads as follows:

"6.12 When a Pay Plan is Established or a Range is Changed:
(a) The rate of pay of an employee who is paid at less than the minimum rate of the scale prescribed for his class shall forthwith be increased to such rate.
(b) The rate of pay of any employee who is paid at any one of the specified rates of the scale prescribed for his class shall not necessarily be changed by reason of the new scale.
(c) The rate of pay of an employee who is paid at a rate between the minimum rate and the maximum rate prescribed for his class but not corresponding with any step of such scale shall be advanced to the next higher step.
(d) The rate of pay of an employee who is being paid in excess of the maximum prescribed for his class shall be reduced to such maximum.
(e) The rate of pay of an employee who is earning a salary in excess of the minimum for his class may be increased to a step in the new range no higher than the corresponding step he occupied at the time the range changed."
The present Civil Service rule on the subject is Rule 6.28, which reads in part as follows:
"6.28 Pay Adjustments Required by Action of Director/Commission.
(c) When a Pay Plan is established or a range is changed upward, each employee occupying affected positions shall have his pay established as follows:
1. The rate of pay of any employee that is less than the minimum rate for the range prescribed for his class, shall forthwith be increased to such rate.
2. The rate of pay of any employee that is on a specified step in the range prescribed for his class shall not necessarily be changed by reason of the new range.
3. The rate of pay of an employee that falls between the minimum and maximum of the range prescribed but not corresponding with any step, shall be advanced to the next higher such step.
4. The rate of pay of an employee who is earning a salary in excess of the minimum for his class may be increased to a step in the new range no higher than the corresponding step he occupied at the time the range changed."
We note that section (d) of Rule 6.12 was removed in Rule 6.28. Thus, an employee under Rule 6.28, who is being paid in excess of the maximum prescribed for his class, will not be reduced to such maximum.
[3] Plaintiffs sought before the Commission, and request of this court, relief which would grant parity only as far back as June 1, 1979, when they began the Grievance Procedure in DOTD. However, plaintiffs now also challenge the constitutionality of the 1975 Pay Plan and have requested this court to grant them "any additional equitable relief adjudged necessary." Additionally, plaintiffs seek an award for reasonable attorneys fees incurred in taking this matter before the Commission and the three appeals to this court, pursuant to La.R.S. 42:1451.
[4] The main thrust of the debates centered around the reorganization of the membership of the Commission, whether Civil Service should be imbedded in the Constitution or not, and the details of its administration. 9 Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, pp. 2594-2768, 3071-3072, 3355-3366, and 3500.
[5] The Louisiana Supreme Court recently held that under La. Const.Art. 6, Sec. 14, the Civil Service Commission of New Orleans was bound to take into account the firemen's Minimum Wage Law, La.R.S. 33:1991, et seq., and the firemen's Supplemental Wage Law, La.R.S. 33:2001, et seq., in establishing a pay plan for its employees. New Orleans, Etc., v. Civ. Service, Etc., 422 So.2d 402 (La.1982).
[6] The State Police Amendment was presented by delegates Flory and Hernandez. Discussion of the amendment produced the following dialogue:

"MR. DUVAL
Mr. Hernandez, I have some sentiment for what you are trying to do here. But, what I don't understand is by a pretty large vote this group decided not to give the legislature any discretion at all. Now, why do we just give the legislature discretion here as [to] the State Police and no other classified employees? How do we justify that?
MR. HERNANDEZ
Mr. Duval, the justification is simply this: in the case of city and parish law enforcement officers, which are not under the direction of the state legislature, they have enacted a program of supplemental pay. Now, if they are going to give supplemental pay to those city and police officers over which they have no control, why should they not extend this same supplemental pay to the state police that are the real law enforcement officers of this state around; it's just to correct an inequity, that is all.
MR. DUVAL
Now, Hernandez, the state police are under the state civil service system; is that right?
MR. HERNANDEZ
The state police are under state civil service; yes, sir.
MR. DUVAL
But, none of the other employees in the state civil service system will be able to be... their pay will not be able to be supplemented; is that right?
MR. HERNANDEZ
That is correct; yes, sir, that is correct...."
The amendment was adopted by a vote of 98 to 8. 9 Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, pp. 2711-2716.
The amendment concerning the officers of the Department of Wildlife and Fisheries was passed with very little discussion at all. In the explanation of the amendment, these officers were compared to State Policemen. It was felt that in enforcing the Wildlife and Fisheries laws of this State, these officers often encounter many of the same hazards as do officers of the State Police. This amendment was passed by a vote of 94 to 13.
9 Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, p. 3071.
[7] Rules 6.1, 6.2, and 6.3 of the Civil Service rules provide as follows:

"6.1 Preparation of Pay Plan.
The Director, after consultation with the appointing authorities and the State Fiscal Officer and after conducting such investigations and research as he may deem desirable, shall cause to be prepared for submission to the Commission a uniform Pay Plan or amendments thereto regulating the compensation to be paid all Classified Service State employees. In the preparation of a Pay Plan for the Classified Service or amendments thereto, the Director shall take into consideration the differences in pay in private business, industry, city and federal civil service systems; Federal rules, statutes, regulations and judicial decisions; and the availability of applicants in the different localities and areas of the State and may propose different rates in the different localities and areas.
6.2 Adoption of Pay Plan.
(a) Any Pay Plan proposed by the Director, or amendment thereof, shall be submitted to the Commission at a public hearing for its consideration.
(b) A Pay Plan, or amendment thereof, when adopted by the Commission after a public hearing, shall become effective only when approved by the Governor in its entirety.
6.3 Rates in Pay Plan
(a) The scale of rates for each class of position shall consist of a minimum rate, a maximum rate, and such intermediate rates as may be adopted by the Commission and approved by the Governor.
(b) Subject to the provisions of Rule 6.4(d), Rule 6.21 and Rule 6.28, each employee shall be paid at one of the rates set forth in the pay plan for the class of position in which he is employed."
[8] The minimum rate in the Pay Plan for both Engineer Specialists III and Engineers III was $1149.00. The maximum rate for both groups was $1772.00.
[9] Appellee briefly addressed the issue of parity by contending that Rule 6.12 did not provide for a two step implementation of the 1975 Pay Plan, by first granting parity and then implementing the Governor's orders; that the only plan in effect on August 2, 1975, was the Pay Plan now in question, and plaintiffs were asking the Commission to grant parity using the previous plan in effect; and that to do so would have been in violation of the Commission's rules. For reasons stated above, we do not find these arguments controlling.
[10] Letter by James W. Jolly, Department of Civil Service Chief, Classification and Pay, dated October 19, 1974, to Robert J. Pierce, President, Louisiana Highway Engineer Association, stating that "due consideration" would be given to the recommendation that Engineer Specialists III and Engineers III have equal salary ranges.

Letter by W.T. Taylor, Director of Highways, dated November 6, 1974, requesting that the classifications of Engineer Specialist III and Engineer III be made equal.
Letter by James W. Jolly, dated November 12, 1974, promising "full consideration" to W.T. Taylor's requests.
Letter by Harold E. Forbes to Senator J.E. Jumonville, promising "full consideration" to his request for equality between Engineer Specialists III and Engineers III. The distinction between the two groups quoted above in our opinion, is mentioned by Forbes in this letter also, dated November 18, 1974.
[11] The actual composition of the Commission at the time the opinion on the merits was handed down, had changed since the presentation by the Engineering Specialists III in 1979. The Commission, before deciding the case in 1982, had received a synopsis covering both sides, presented by counsel for appellee, and a rebuttal memorandum presented by plaintiffs.
[12] In House Concurrent Resolution No. 242, the Legislature recognized that the Board of Highways Resolution of November 20, 1974, and the August 2, 1975 Pay Plan promulgated by the Commission, both intended that the pay scales for Engineer Specialists III and Engineers III be identical. It further recognized that plaintiffs were demoted in steps as a result of minimum implementation, and also that new employees had been promoted to steps of rank above plaintiffs, who were older employees holding the rank of Engineer Specialist III. The Resolution states:

"WHEREAS, the implementation of the Pay Plan of August 2, 1975, unjustifiably deprived these Engineering Specialists III of the steps of rank which they had earned by reason of longevity and satisfactory service ratings;..."
The Resolution then goes on to recommend corrective action.
[13] An additional letter from Daniel E. Sullivan, Executive Director of the Louisiana Civil Service League (prior to the Bonfanti letter), dated November 18, 1980, was sent to Paul Hardy requesting the implementation of the 1975 Plan be corrected and that the Engineer Specialists III be made equal with Engineers III.
[14] Delegate Dennery, who had served on the State Civil Service Commission for ten years, and who was its Chairman for six years, in discussing the Flory amendment, stated:

"Now one point that Mr. Flory made I believe in answer to a question, was the problem of listening to the legislature when it came to pay raises. The whole theory of a civil service system is to have equal pay for equal work. The whole theory behind the present civil service system, and I believe it should be behind any future civil service system, should be based on the same thing."
9 Records of the Constitutional Convention of 1973: Convention Transcripts, p. 2601.
[15] Plaintiffs alleged and counsel for the Department of Civil Service did not dispute that Governor Edwin Edwards lended aid to a legislative delegation comprised of Representative Richard Baker and Senator J.E. Jumonville some time in 1973 or 1974, which brought the problems of Engineer Specialists III to the attention of the State Department of Civil Service. This fact is inconsistent with any intent on the part of Governor Edwards in 1975 to destroy the parity intended for these two groups by the 1975 Pay Plan.
[16] When asked at oral argument if counsel for plaintiffs was asking this court to find that the intent of the Governor's orders and the Pay Plan was to grant parity, counsel responded by stating that it was no longer just a question of intent, but of result.
[17] The instructions contained in State Personnel Manual Transmittal Sheet, No. 169, were as follows:

"1. The rate of pay of an employee who is being paid at less than the minimum rate of the scale prescribed for his class shall be increased to such rate.
2. The rate of pay of an employee who is being paid at a rate between the minimum rate and maximum rate prescribed for his class but not corresponding with any step of the new range shall be advanced to the next higher step.
3. If the adjustments in 1 or 2 above would grant the employee less than one-half of a step increase, he shall receive the adjustment plus one additional step.
4. If the adjustments in 1 or 2 above would grant the employee one-half or more of a step increase he shall receive only the adjustment. [Emphasis added]
THE ABOVE ADJUSTMENTS ARE SUBJECT TO THE RULE THAT NO EMPLOYEE'S SALARY MAY BE INCREASED TO A STEP IN THE NEW RANGE HIGHER THAN THE CORRESPONDING STEP HE OCCUPIED AT THE TIME THE RANGE CHANGED."
The rest of the Transmittal Sheet contained examples for implementation, and a listing of the old and new pay ranges for the various classifications.
[18] Footnote No. 7, supra.
[19] Delegate Duval suggested an amendment during the Convention which would have granted the Legislature the same right of approval. During the debates surrounding this amendment, it was clear that the usual procedure followed is that the Commission establishes a plan and submits it for approval to the Governor, who may merely approve or disapprove it. He should not approve if there are insufficient funds appropriated by the Legislature for its implementation. It was felt that if he did grant such approval with insufficient funds, the plan would have the effect of law, and the Legislature would be forced to appropriate the funds. If he disapproves a plan, he should send it back to the Commission for their modification and resubmission. Delegate Duval commented in support of this amendment:

"Presently, the Civil Service Commission promulgates pay scales, which when approved by the governor, have the effect of law.... Actually, if you consider the bureaucracy, three branches of government, and have a dialogue so that something can be worked out without the commission and the governor going ahead and approving a pay plan, and then the legislature sitting there having to find the money for it, and we, the people to have to pay it. I just think it ought to go through the same process as other things. The commission has a lot of autonomy under the Dennery proposal. Their regulations and rule making power have the effect of law. I merely think that their appropriation power which is, this is tantamount to, should not have the effect of law. It should require approval [by the Legislature] before implementation."
The following dialogue is also pertinent:
"MR. DENNERY
Well, you understand, of course, under the way the present system works, Mr. Duval, is that the money ... the pay plan doesn't become effective in fact, unless the legislature appropriates the money.
MR. DUVAL
It becomes effective in law though as I read it. It becomes effective in law.
MR. DENNERY
It could. But, obviously, the governor is not going to approve a plan until the money is there to meet it.
MR. DUVAL
Well, I don't know if that's ... I just say what could be is one thing, but what should be, is another thing.
MR. DENNERY
Well, now let me ask you one other question, Mr. Duval. Do I understand you to mean that the legislature then has the right to amend or merely to approve or disapprove?
MR. DUVAL
Merely approve or disapprove."
This dialogue shows that the delegates felt the Governor also was limited to approval or disapproval. And finally, Delegate Womack stated:
"The civil service has the responsibility of submitting to the governor their proposal in a new pay plan. It's up to the discretion and wisdom of the Executive Department to either accept or reject that plan. If the Executive Department rejects the plan and sends it back to civil service, as the usual rule, the governor will submit what he thinks is a better proposal. It may beand I know in one casethe governor felt that the low paid employees weren't rated quite enough it, and more consideration should be given. Civil service agreed to it and they gave additional consideration to the low paid employees."
The amendment was rejected 22-70. 9 Records of Louisiana Constitutional Convention of 1973: Constitutional Transcripts, pp. 2709-2710.
[20] Pay plans established by the State Civil Service Commissions are subject to approval by the Governor. Pay plans established by City Civil Service Commissions are subject to approval by the City (usually through the mayor or chief administrative officer). The power of approval by these different executives has been analogized by our courts. See Barnett v. Develle, supra, at pp. 143, 145, where the court overruled Louisiana Civil Service League v. Forbes, supra, only as far as making a distinction between the ultimate authority of the State and City Commissions.
[21] In Civil Service Commission v. Rochon, supra, the court suggested to the City and the firemen that their proper avenue for relief was to file suit against the Commission to compel them to alter their pay plan. 347 So.2d at 167; and See New Orleans Firefighters Association, et al., supra, footnote 1. The result of that statement was the suit filed in New Orleans Firefighters Association, et al., supra.
[22] Footnote 2, supra.
[23] Footnote 11, supra.
[24] Delegate Flory commented:

"What you are doing by that is depriving the faithful servants of this state, who have given their life and dedication of service to this state. Now, all I had said the other day, and I've had some conversation with people in civil service; I know what they do with regard to length of service today, they do give credit, they do give consideration to length of service. All we were doing the other day was constitutionalizing what is the actual practice in the Civil Service System today. I am told that in practically every system to my knowledge, that consideration is given to length of service; ..."
And further,
"I think it's extremely important, as a factor in keeping the dedicated employees that we have in this state. So, this is one of the incentives that they have to retain in state employment, is to know that they're going to be given some consideration, if they give their life to state governmentthat they'll be given some consideration when a promotion comes about, in order to be considered for that position."
The amendment was rejected by a vote of 44 to 48. 9 Records of the Louisiana Constitutional Convention of 1973: Constitutional Transcripts, pp. 2746-2748.
[25] See Issue Three.
[26] 9 Records of the Louisiana Constitutional Convention of 1973: Constitutional Transcripts, pp. 2594, 2712.
[27] Footnote 19, supra.
[28] The record contains a letter from Anthony J. Bonfanti, Executive Assistant General Counsel of DOTD, previously mentioned in footnote 13, the contents of which reveal the confusion at the Commission and in the Department of Civil Service surrounding its own interpretation of Rule 6.12, regarding a department's authority to implement a plan. The letter states, in part:

"This attorney was advised by Mr. Verdi Adam that when the Louisiana Department of Transportation and Development attempted to fully implement the pay change of 1975 for all employees sometime in the year of 1977 or 1978, it was told by Civil Service that it could not do so. It was the position of Civil Service that subsequent pay plans effectively destroyed DOTD's right to fully implement the 1975 pay plan. Now, they apparently have changed their mind. This attorney personally was advised by Civil Service that the granting of extra steps was frowned upon by Civil Service and it was very seldom granted for any reason. It has only been since the initiation of the Thoreson, et al lawsuit that Civil Service now tells us that we could use its Rule 6.15(a) as a vehicle to grant the Engineer Specialists their step increases as per Mr. Richard Cadwallader's letter of April 1, 1981. It is my opinion that said Rule was not passed or intended for use in the manner now espoused by the Civil Service Counsel, Laura Holmes, but said Rule can certainly be read in the manner that she is now interpreting it. Civil Service Rule 6.15(a) would only require action by the Department of Transportation and Development and no approval would be necessary by the Civil Service Commission to implement same. Previously, the only vehicle that we understood to be available to us was Civil Service Rule 6.16 which would be the granting of extra steps based on the approval of Civil Service which we further understood seldom if ever was granted."
[29] Plaintiffs sought attorney's fees under the provisions of La.R.S. 42:1451. We find that statute to be inapplicable to the facts and issues presented in this case, so we cannot award any attorney's fees.
[1] This section, as recently amended, provides that employees shall have the right to appeal such cases pursuant to La. Const.1974, article 10, section 12. Section 12 provides, in pertinent part:

"The State Civil Service Commission shall have the exclusive power and authority to hear and decide all removal and disciplinary cases, with subpoena power and power to administer oaths."
And further, in the same paragraph:
"The final decision of the commission shall be subject to review on any question of law or fact upon appeal to the court of appeal wherein the commission is located, upon application filed with the commission within thirty calendar days after its decision becomes final."
[2] Civil Service Rule 13.10 provides in pertinent part:

"13.10 Appeals to the Commission.
An appeal may be made to this Commission by
. . . . . .
(b) Any person in the Classified Service who, having acquired permanent tenure, alleges that he has been demoted, dismissed, discriminated against, or subjected to any disciplinary action contrary to any provision of the Article or of the Rules of this Commission. (c) Any person in the Classified Service who alleges that he has been deprived of any right, discriminated against, or adversely affected by the violation of any provision of the Article or of any Rule of this Commission. (d) Any person in the Classified Service who shall have failed to obtain relief from an allocation or reallocation of a position to a class or by the Classification Plan or any change thereof after a written request for review thereof by the Director or his representative as provided in Rule 5.3 and who alleges that the Director's decision has been discriminatory.
. . . . . .
(f) Any person who shall have applied for or been examined, for the Classified Service, without having acquired permanent status therein, and who alleges discrimination in the review of his application, admission to an examination, scoring of examinations, the establishment of an eligible list, or certification therefrom.
(g) By any person expressly granted the right to appeal to this Commission by the Article or by any Rule of this Commission.
(h) Any person who alleges that he has been the subject of discrimination as defined in Rule 1.14.1.
(i) Any person who alleges that he has been discriminated against by any official action taken by the Director.
(j) Any person seeking a review of a decision made by an appointing authority under the provisions of Rule 10.4.
(k) Any person in the Classified Service who alleges that he has been demoted, dismissed, discriminated against, or subjected to any disciplinary action based solely on the grounds assigned for an unsatisfactory service rating.
(l) Any applicant for employment in the Classified Service and any employee in the Classified Service who alleges that he has been discriminated against because of his membership or nonmembership in any private organization."
We note that La. Const.1921, article 14, section 15(N)(1), the predecessor article to La. Const. 1974, article 10, section 8, provided in pertinent part that "[n]o person in the State or Classified Service, having acquired permanent Civil Service status, shall be demoted, dismissed, or discriminated against, except for cause, expressed in writing by the appointing authority." This court, in Hays v. Louisiana Wild Life and Fisheries Com'n, 165 So.2d 556 (La.App. 1st Cir.1964), writ denied, 246 La. 855, 167 So.2d 672 (1964), interpreted this provision as intending to prevent permanent classified servants from discrimination in any manner or form whatsoever.
[3] In The Work of the Louisiana Appellate Courts for the 1974-75 Term, 36 La. Law Rev. 464, 472 (1976), the Flores decision was commented on as follows:

"Flores v. State Department of Civil Service settles an important question for the civil service practitioner; it holds that judicial review of civil service commission rulings lies only in the appropriate court of appeal and not in the district courts. Judicial review in civil service cases is thus in the nature of an appeal and not trial de novo. The First Circuit Court of Appeal rejected the argument that the general judicial review provision of the Louisiana Administrative Procedure Act authorizes review in the district court, and the supreme court denied writs, pointing out that the Louisiana constitution expressly provides that appeals from civil service commissions are to be taken exclusively to the appellate courts." (Footnotes omitted.)